## COLUMBIA GAS TRANSMISSION CORPORATION, Petitioner,

v.

## FEDERAL POWER COMMISSION, Respondent,

### United Gas Pipe Line Company, Intervenor.

### No. 74–2105.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 16, 1975.

Decided Feb. 11, 1976.

H. L. Snyder, Charleston, W. Va., with whom Daniel L. Bell, Jr., Charleston, W. Va., was on the brief, for petitioner.

John J. Lahey, Atty., F. P. C., of the bar of the Supreme Judicial Court of Mass., pro hac vice by special leave of Court for respondent. Drexel D. Journey, Gen. Counsel, F. P. C., John R. Staffier, and William J. Grealis, Attys., F. P. C., Washington, D. C., were on the brief, for respondent. Allan Abbot Tuttle, Sol., F. P. C., also entered an appearance for respondent.

Jeron Stevens, Houston, Tex., with whom I. Jay Golub, William B. Cassin and Phillip D. Endom, Houston, Tex., were on the brief, for intervenor.

Before McGOWAN and LEVENTHAL, Circuit Judges and McMILLAN,* United States District Judge for the Western District of North Carolina.

LEVENTHAL, Circuit Judge:

These petitions to · review Federal Power Commission certificate orders amount, on analysis, to a challenge to the FPC's ruling that the underlying contractual arrangements entitled United Gas Pipeline Co. to 120,000 Mcf/d from Humble Oil & Refining Co.'s natural gas production in the Garden City Field, and that this entitlement would be respected even though United later bettered its position in that field, especially in relation to Columbia Gas Transmission Corp. In our view the FPC acted within the permissible range of an administrative agency in both its construction of the contracts, and its certificate order. Taking into account this record, and the way the parties shaped their position before the agency, we cannot condemn the FPC on the ground that the broader non-contractual elements of public interest required a different result. We affirm.

In its order, issued on October 16, 1974, in its Docket C172–674, Texas Gas Exploration Corp., et al., the FPC—

a. Issued certificates authorizing Texas Gas Exploration (Texas Gas), et

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

al.[1] to sell certain of their gas to United;

b. Held that the contractual and statutory obligations of Humble[2] and Cullen to deliver 120,000 Mcf of gas per day to United from the Garden City Field were not reduced by the volumes sold to United by Texas Gas, et al. under the certificates issued in that order; and

c. Held that Texas Gas et al. could collect only the area rate for "old gas" for the volumes sold under those certificates.

The facts are available from the opinion of Administrative Law Judge Kanell, adopted by the FPC, and will not therefore be restated at any length. It suffices to say that on June 15, 1958, Humble and Cullen entered into a contract with United giving United the right to purchase all of their Garden City Field gas. In 1963, Humble and Cullen desired to sell some of their Garden City gas to Columbia Gas, and amended their contract with United on June 18, 1963. The 1963 amendment, sometimes referred to by the parties as a "carveout agreement," provided insofar as pertinent:

1. Humble and Cullen were obligated to deliver to United a maximum of 120,000 Mcf of gas per day, (this freed any excess to be sold to Columbia.)

2. The maximum daily delivery obligation of 120,000 Mcf would be reduced by any volumes received by United under "contracts as now in effect with Buyer's [United's] other suppliers" in the Garden City Field.[3]

3. Humble and Cullen could meet their daily delivery obligation to United by delivering their own gas or other gas from the Garden City Field which either Humble or Cullen "shall from time to time have the right to market or dispose of for others".

On June 28, 1963, Humble and Columbia[4] executed an agreement which provided that Humble would warrant delivery of 6.1 trillion cubic feet (Tcf) of gas to Columbia from a number of fields. Humble further agreed that a portion of its Garden City Field gas, over and above the volumes required to fulfill its obligations to United, would be delivered toward the 6.1 Tcf. On the same day Cullen also entered into a contract to sell Columbia a portion of its excess gas, i. e., Garden City Field gas in excess of that required to meet its obligation to United.

Between 1963 and 1971, Cullen had the right to market Garden City Field gas for Texas Gas and others, and delivered their gas to satisfy part of its obligation to United under the 1963 amendatory contract. These authorizations were revocable. Humble never had the right to market the gas of Texas Gas. On May 2, 1971, Cullen obtained small producer certificates,[5] and notified Texas Gas *et al.* as of May 2, 1971, it would no longer market their gas. Texas Gas *et al.* thereupon entered into negotiations with United that culminated in 1972 contracts to sell to United 8,400 Mcf/d out of the Garden City Field gas formerly marketed for them by Cullen. When the amounts of those deliveries were deducted by Humble from the amount it delivered to United, United complained to the FPC and sought a declaratory ruling as to the meaning of the contract.

The proceeding before the Federal Power Commission required the Commission to determine the validity of United's complaint that it was entitled to 120,000 Mcf/d[6] from Cullen and Humble under

---

1. Texas Gas et al. includes Texas Gas, Gulf Oil Corporation (Gulf) and Southern Natural Gas Company (Southern).

2. "Humble" is retained throughout although Humble Oil & Refining Co. was succeeded by Exxon Corp.

3. As of this June 18, 1963, amendment, United was also purchasing Garden City gas from British American and Gulf under outstanding contracts.

4. The contract was with Columbia's predecessor, namely United Fuel Gas Company.

5. Pursuant to FPC Order 428, 18 C.F.R. 157.40.

6. United thus contended that the volumes of gas furnished to it by Texas, Gulf and Southern should be excluded from the calculation of its 120,000 Mcf daily entitlement from Cullen

the 1963 agreement. Humble took the position that the contract, properly interpreted, permitted it to deduct from the 120,000 Mcf/d obligation such additional amounts as United might obtain from other suppliers in the Garden City Field who had formerly supplied gas to Cullen as their marketing agent for sale to United instead of contracting directly with United. The Administrative Law Judge construed the contract to agree with the interpretation advanced by United, and also accepted by Cullen, that the clause providing for deduction of volumes received by United under "contracts as now in effect with Buyer's other suppliers" referred to amounts obtained by United from British Petroleum and Gulf, the suppliers in the Garden City Field with which it had contracts in effect on June 18, 1963 (see note 3). Humble did not petition for review of the adverse ruling.

Columbia's petition to the FPC for review took the position previously advanced by Humble.[7] The FPC adopted the construction of the contract set forth by the Administrative Law Judge. We affirm.

■ The FPC's interpretation of the contract is in accordance with its literal terms, and is supported by a plausible explanation of the intendment of the parties. We would likely have reached the same interpretation ourselves, but should in addition note that there is room, in review of administrative agencies, for some deference to their views even on matters of law like the meaning of contracts, as on the meaning of statutes, where the understanding of the documents involved is enhanced by technical knowledge of industry conditions and practices. *See Gulf States Utilities Co. v. Federal Power Commission*, 171 U.S.App.D.C. 57, 518 F.2d 450, 457 (1975).

Columbia advances the separate contention that the FPC's ruling amounts to permitting United to take the 120,000 Mcf/d from Humble plus up to 8,400 Mcf/d from Texas Gas *et al.*—and thus to take more from the field than was previously the situation. This, says, Columbia, can only be done in a proceeding under § 7(b) of the Natural Gas Act, in which Texas Gas seeks abandonment as to supply to Columbia, as well as the certification under 7(c) of its supply to United. And this can only be done in a comparative proceeding which takes into account the large elements of public interest inherent in shifting entitlements to gas supply.

■ Where there is an abandonment or curtailment of service, the Commission has an obligation to consider not only the contract situation but larger elements of public interest, including the entire situation of the pipelines competing for purchase. *Transcontinental Gas Pipe Line Corp. v. FPC*, 160 U.S.App. D.C. 1, 488 F.2d 1325 (1973), *cert. denied sub nom. Natural Gas Pipeline Co. v. Transcontinental Pipe Line Corp.*, 417 U.S. 921, 94 S.Ct. 2629, 41 L.Ed.2d 226 (1974); *Michigan Consolidated Gas Co. v. FPC*, 108 U.S.App.D.C. 409, 283 F.2d 204, *cert. denied*, 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960), cited in *Transcontinental Gas*, 160 U.S.App.D.C. at 5, 488 F.2d 1325. But the present case and record was not presented in these terms, as a comparative case or a broad public interest question. The proceeding was shaped as one involving a contract interpretation. In the proceeding before the FPC, Columbia tendered no evidence bearing on broad public interest questions, such as the comparative position of the United and Columbia pipelines, or even on whether its overall gas entitlement would fall in fact. The case was one involving an extremely modest amount, in comparison with supplies going to Columbia from Humble and to

---

and Humble. Any Garden City gas obtained under its contracts with British Petroleum and Gulf, however, would be included in the 120,000 Mcf calculation.

7. We do not question the standing of Columbia to raise the question, nor did the FPC, for

the more gas United has a right to get from Humble-Cullen under its 1963 contract, the less gas Columbia has a right to demand under its 1963 contractual right to take what is left after the sellers satisfy the contractual commitments to United.

United. Columbia's counsel says the party proposing the application has the burden of proof. But the FPC can give some presumptive weight to contract arrangements, as Transco recognizes (see 160 U.S.App.D.C. at 5, 488 F.2d at 1329). Columbia should have offered some reasoning as to why the contracts should be rejected.

■ Putting formality aside, and looking to broader issues, there is merit in principle that the overall "public interest," and not mere contract arrangement, should govern whenever there is a considered challenge to what is in fact a transfer of supply from one pipeline to another. That public interest background can be assured in the 7(c) proceeding to certificate the new purchaser. Again, since the volume of gas involved is relatively small and the parties did not present the broader public interest question to the Commission, we do not on this record fault the Commission for taking and deciding the case as the parties laid it before them. *See FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976).

Columbia accused the FPC of inconsistency, in that it recognized that Texas Gas et al. must be treated as producers already engaged in the pertinent supply arrangement, for it held Texas Gas to a flowing gas rate, and did not permit it to charge the rate set for new gas. But the ruling that Texas Gas had dedicated its gas to interstate commerce, for rate purposes, does not mean the gas had been contractually dedicated to United.

Taking the case as it was shaped by the parties, we cannot say that the FPC was faithless to its obligation to consider the public interest.

*Affirmed.*