561 P.2d 391

The BUNKER HILL COMPANY, Appellant,

v.

The WASHINGTON WATER POWER COMPANY,

and

Idaho Public Utilities Commission, Respondents.

No. 12085.

Supreme Court of Idaho.

March 11, 1977.

Robert E. Brown of Brown, Peacock, Keane & Boyd, Kellogg, for appellant.

Paul D. McCabe, Coeur d'Alene, Robert L. Simpson, of Paine, Lowe, Coffin, Herman & O'Kelly, Spokane, Wash., for Washington Water Power Co.

Wayne L. Kidwell, Atty. Gen., Dan L. Poole, Conley E. Ward, Jr., Asst. Attys. Gen., Boise, for Idaho Public Utilities Com'n.

BISTLINE, Justice.

Appellant, Bunker Hill Company, operates an electrolytic zinc plant at Kellogg, Idaho, which receives its electric power as a special contract customer of respondent, Washington Water Power Company (the Power Company). A contract between the parties which dates from June 1, 1956, and which has been approved by the Idaho Public Utilities Commission (P.U.C.) provides

for a rate review at four-year intervals at the request of either party. In 1970, the Power Company made its first request for such a review and in April, 1973, the contract was amended to provide for an immediate 5 per cent increase for Bunker Hill and another 3 per cent increase, effective January 1, 1974. The amendment also provided for further adjustments should the P.U.C. authorize a revision in the monthly rate of the Power Company's "Extra Large Service" tariff (Schedule 22). In August, 1974, the P.U.C. authorized such a rate increase of 14.3 per cent in the Schedule 22 tariffs.

In October, 1974, the Power Company requested another rate review, as specified in the Bunker Hill contract. Two points were at issue. First, the parties disputed the numerical results which followed from the 1973 amendment and the subsequent tariff increase. Second, the Power Company proposed four years of progressive increases so that Bunker Hill would reach the full level of Schedule 22 accounts by 1978.

These issues were still being negotiated when, in March, 1975, the Power Company again went before the P.U.C. seeking a general 4 per cent rate increase. Bunker Hill intervened at the hearings, opposing the general rate hike and seeking a ruling that its version of the contract amendment was correct.

The P.U.C.'s order No. 12069 of August 5, 1975,

    (1) ruled against Bunker Hill on the contract interpretation question, thus granting the Power Company a 16.15 per cent increase, retroactive to 1974;

    (2) found that the Power Company's plan of progressive rate increases for Bunker Hill through the year 1978 was fair and reasonable; and

    (3) granted the Power Company a 4 per cent general rate increase.

Bunker Hill filed a timely Petition for Rehearing in which it challenged each of these three rulings. The Petition was denied by the Commission on September 24, 1975. This appeal was taken from the Commission's orders.

For reasons stated below, we set aside the Commission's Order.

## I.

At the conclusion of their rate review negotiations in 1973, Bunker Hill and Washington Water Power Company amended their 1956 contract as follows:

" . . . if the Idaho Public Utilities Commission approves or authorizes revisions in the monthly rate in the schedules for the Power Company's 'Extra Large Service' tariff(s) for electric service, the effective monthly rate set forth in Section 5 hereof will be the monthly rate effective January 1, 1974, as set forth above, adjusted in the amount of and to reflect all rate revisions so approved by the Idaho Public Utilities Commission in the Power Company's 'Extra Large Service' tariff(s) for electric service provided."

In August, 1974, the P.U.C. in Case No. U–1008–86, approved the Power Company's new tariffs, effective November 13, 1974. (Order No. 11563) The Power Company increased Bunker Hill's contract rate by 16.15 per cent—an amount it determined by applying both the present Schedule 22 rate and the former Schedule 22 rate to Bunker Hill's 1973 load data, and then applying the resulting percentage increase to each step of the contract rate in effect on January 1, 1974. Bunker Hill interpreted the amendment to require a 14.3% increase—an amount corresponding to the percentage increase in all of the Idaho Schedule 22 customers as a class. (C.T. 38–39) For each month after November, 1974, Bunker Hill recomputed its monthly bill and withheld the difference between the 14.3 per cent increase it deemed appropriate and the 16.-15 per cent increase insisted upon by the Power Company.

This issue was still being negotiated by the parties when, on March 5, 1975, the Power Company made application to the P.U.C. for a 4 per cent general rate increase. Bunker Hill petitioned to intervene in opposition to the general rate increase

and, with regard to its own particular dispute, offered to prove that 14.3 per cent was a "fair and equitable" increase according to the terms of the amended contract.

At the hearing before the P.U.C. in May, 1975, Bunker Hill argued that an increase of 16.15 per cent—when other Schedule 22 customers were only to be increased an average of 14.3 per cent—was discriminatory treatment, in violation of its right to equal protection of the law. Furthermore, bunker Hill argued that the increase was unjustified. The Power Company, during the 1974 hearing that established the new tariff, had only requested a $269,000 increase in revenue from all special contract industrial customers subject to this tariff. An increase of 14.3 per cent would generate $290,000 income from Bunker Hill alone; an increase of 16.15 per cent would generate $333,000—or an amount which exceeded the Power Company's actual request by nearly $65,000.

■ The Power Company argued that none of its schedules is ever based upon the condition that all customers within a class experience the same percentage increase. Indeed, no customer subject to a given tariff ever pays the *average* increase. Each individual customer experiences a unique percentage increase which depends upon the characteristics of its own electrical load. Deviations from the average because of the unique make-up of each customer are precisely what go to make up the average and certainly do not constitute unequal or discriminatory treatment in any constitutionally objectionable sense.

■ The P.U.C. in its Order No. 12069 settled this dispute in favor of the Power Company:

"We have reviewed the Zinc Plant Contract, the April 1973 amendment (Exhibit 1–A), and related documents, and we conclude that Applicant's interpretation of said provisions is correct, and will be adopted by the Commission for purposes of this hearing." (C.T. 39)

Bunker Hill argues that by so ruling in favor of the Power Company, more revenue will be generated than was originally requested by the Power Company in its 1974 rate increase application. This fact, if true, is not material. Projections of revenue are always imprecise; indeed, the 1975 hearing was required because of a shortfall of net income due to miscalculations made in the 1974 hearing. We are cited to no authority which holds that customers can withhold payments on part of an increase in hopes of a rebate should their category produce more revenue than was originally anticipated by the Power Company and the P.U.C.

■ It must be stressed that the Commission's decision in this matter is an interpretation of imprecise contractual language, not an abrogation of a contractual agreement. Since the parties agreed to let the P.U.C. settle this dispute and since there is substantial evidence in the record to support the Commission's decision, it will not be disturbed on appeal. *Nez Perce Roller Mills v. Public Util. Comm'n*, 54 Idaho 696, 34 P.2d 972 (1934).

II.

Bunker Hill is the Power Company's largest Idaho customer. Its electrolytic zinc plant alone consumed 38.40 per cent of the 1973 kWhs of industrial power provided by the Power Company in Idaho, and 21.65 per cent of the Power Company's total kWh sales of electric power in Idaho during 1973. Bunker Hill receives its power at the lowest rate of any Idaho consumer, as the following table of 1974 charges indicates:

| | | |
|---|---|---|
| Commercial customers | 15.4 | mills per kWh |
| Residential customers | 11.9 | " " " |
| Average of all industrial customers | 6.1 | " " " |
| Average of all industrial customers under contract | 5.26 | " " " |

Bunker Hill Zinz Plant          *4.62  mills per kWh

*This figure includes the 16.15 per cent increase the Power Company sought to collect in 1974.

---

The practice of providing bargain rates to a utility's largest customers grew up in an age of cheap power. The wisdom of this practice has been questioned in recent years as the public has become more aware of the political, economic and environmental costs imposed on society. In a move characterized as the "progressive elimination of preferential treatment," the Power Company proposed a four-stage rate increase in order to bring Bunker Hill up to 100 per cent of Schedule 22 ("Extra Large Service" customers) by 1978. This schedule was proposed to the P.U.C. "in lieu of the present contract rate and the rate amendment clause" agreed to in 1973. The proposal was accepted by the P.U.C. in its Order No. 12069 of August 8, 1975:

THE COMMISSION HEREBY ORDERS AS FOLLOWS: . . . THAT the Washington Water Power Company should make all industrial customers subject to filed tariff rate schedules as soon as practicable; and that Bunker Hill should be made subject to filed tariff Schedule 22, through progressive steps, to be fully effective by October 1, 1978, as proposed by the Washington Water Power Company.

■ This aspect of the case presents the same problem which the Court recently faced in *Agricultural Products Corporation (now Beker Industries) v. Utah Power & Light Co.* and *Idaho Public Utilities Commission,* Idaho, 557 P.2d 617 (1976), namely, the status of private rate contracts in the scheme of public utility regulation. That case laid down the general principles which apply. On the one hand, the State, by virtue of its police power, has the right to regulate public utilities. No regulated monopoly can contract away its duty to serve the public interest or the state's right to enforce that obligation. *Midland Realty Co. v. Kansas City Power and Light Co.,* 300

U.S. 109, 57 S.Ct. 345, 81 L.Ed. 540 (1937); *Sandpoint Water and Light Co., Ltd. v. City of Sandpoint,* 31 Idaho 498, 173 P. 972 (1918).

■ On the other hand, it was held in *Agricultural Products* that:

". . . the Idaho legislature intended to allow public utilities to enter valid private rate contracts when it created the statutory structure for public utility regulation." *Agricultural Products Corp. v. Utah Power & Light Co.,* Idaho, 557 P.2d at 622.

*See* I.C. §§ 61–307, 502–3, 622–3. Such contracts are protected from governmental interference by the Idaho Constitution, art. I, § 16, which provides that no "law impairing the obligation of contracts shall ever be passed."

■ The constitutional protection against impairment of contracts thus acts as a constraint upon the state's power to alter contracts, and the state may not interfere with a utility contract unless it finds that the rate

". . . is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." *Federal Power Comm'n v. Sierra Pac. Power Co.,* 350 U.S. 348, 355, 76 S.Ct. 368, 372, 100 L.Ed. 388 (1956).

In order to carry out this policy, this Court endorsed the procedures adopted by the New York Public Service Commission when dealing with private contracts:

" 'Under the procedure we adopt here, a determination of undue discrimination or preference must first be made in a rate proceeding wherein all pertinent factors are considered, including, among others, the provisions of the special contract, the

relationship between the contracting parties, the cost of service, the financial condition of the utility, and the effect of contract rates on other customers. In the rate proceeding, the commission will consider whether some preferential rate may be appropriate in light of the special circumstances surrounding each special contract. If it is then determined that the rates charged under special contracts are unduly discriminatory or preferential, we will order the utility to collect from contract customers sufficient revenues to eliminate any deficiencies.' *Re Consolidated Edison Co.*, 4 P.U.R.4th 199 (N.Y. Pub.Ser.Comm'n 1974)." *Agricultural Products Corp. v. Utah Power & Light Co.*, Idaho, 557 P.2d at 624.

■ This Court in *Agricultural Products* was faced with the precise question raised on this appeal, namely, "may a contract rate be raised merely to bring it to a level uniform with other customers?" We replied in the negative:

"The statutes do not prescribe uniform rates for all customers. It cannot be inferred that the commission may alter contract rates merely to accomplish uniformity." 557 P.2d at 624.

A mere difference in rates, it was held, is not necessarily an "unreasonable difference" of the sort forbidden by I.C. § 61–315. Applying these principles, we there held:

"Before the Commission may authorize a rate increase to bring Agricultural Products up to the level of industrial class customers, the Commission must find that Agricultural Products should reasonably be expected to pay the same rates . . . ." 557 P.2d at 625.

In the case before us, the Commission assumed that uniformity in rates among all the Power Company's heavy industrial customers was *per se* desirable. The terms of Bunker Hill's special contract were then abrogated so as to bring its rate structure up to the level of all other industrial customers. This is precisely the same procedure which was held defective in *Agricultural Products*.

Bunker Hill's expert witness presented detailed testimony to the effect that its zinc plant load is "unique" and, therefore, that its "electric power rate should not be Schedule 22 or be based on or referenced to Schedule 22." As evidence of Bunker Hill's uniqueness, he argued that while Bunker Hill's rates remained stationary from 1960 to 1973, other customers received four rate decreases; that Bunker Hill owns, operates, maintains and pays taxes on the substation and transformer facilities necessary to transform energy from the 110,000 volts it purchases into utilizable voltages; that the zinc plant load is uniform and is not affected by the seasonal variation which afflict the state's other major industries; that the plant's average monthly power factor of 91.67 per cent is higher than that of most other Power Company accounts and causes savings to the Power Company by reducing the amount of reaction current it must supply; that the plant's large single block of energy supplied at one metering point, and billed on a single invoice, cuts utility company accounting costs; that zinc plant production has frequently been sacrificed when the Company's system-wide problems have necessitated power cutbacks; and, finally, that the Power Company's transmission and distribution costs are extremely low for Bunker Hill's electric service compared to costs for servicing the other 421 Idaho industrial customers.

This testimony regarding Bunker Hill's uniqueness—and thus the reasonableness of its unique rate—stands unrebutted. The comments offered by the Power Company's President dealt only with the impact on power company operations. No data on Bunker Hill's comparability with other industrial customers were presented and Bunker Hill's repeated efforts to obtain such data were fruitless.

Bunker Hill has produced evidence of its uniqueness. The burden of further production and of ultimate persuasion is on the utility proposing a change in contract rates. In the absence of substantial evidence on the record and an explicit finding by the P.U.C. that the existing contract rates are

adverse to the public interest, we must set aside this order.

\*    \*    \*    \*    \*    \*

Bunker Hill also objects to the P.U.C. as a forum for settling what it considers to be a private contract dispute. The contract between the parties contains the following language:

"If at any time any dispute, difference or question shall arise between the parties hereto concerning the application, construction or meaning of any of the provisions of this agreement, or the amount of adjustment in the rate . . . then upon demand of either party the matter in dispute, difference or question will be referred to arbitration. And offer of such reference to arbitration will be a condition precedent to any proceeding at law or in equity concerning such matter or dispute . . . ."

Bunker Hill argues that the Power Company's resort to the P.U.C. for a ruling on Bunker Hill's 1974–1978 rate structure, when negotiations had barely begun on this matter and had certainly not reached an impasse, was in violation of the contract provision for the arbitration of such disputes.

Even the Commission seemed somewhat startled by this procedure, as indicated in the dialogue between counsel for Bunker Hill and Commissioner Shurtliff:

COMMISSIONER SHURTLIFF: You say they have asked for three other increases . . . . And they are asking this Commission to grant that approval of that request?

MR. BROWN: That's right.

COMMISSIONER SHURTLIFF: By what manner have they asked the Commission to do this?

MR. BROWN: It arises out of this contract dispute. We have never heard of any procedure quite like it. (R.T. 25–26)

Nor did counsel for the Power Company offer an accurate assessment of the situation when questioned on the matter:

COMMISSIONER SHURTLIFF: Have they moved or are they seeking these requests pursuant to that contract or pursuant to the application filed with this Commission?

MR. SIMPSON: Mr. Brown is mistaken. We are not asking this Commission to approve anything beyond the rate application resulting from this Commission's last order and the application of this case. Mr. Brown is talking about simply a proposal we made to Bunker Hill to resolve the matter . . . . That was only a proposal.

We are not asking this Commission to approve that proposal in this hearing. (R.T. 26–28)

Nonetheless, the President and Chairman of the Board of Washington Water Power Company, in testimony which begins only three pages after the above exchange, stated that the progressive increases to Bunker Hill from 1975 through 1978 *were* part of the Power Company's rate proposal during this application. And the proposal was adopted by the Commission, as noted in its Order.

■ Again, we take our bearings here from the principles laid down in *Agricultural Products* to govern the status of private contracts before the P.U.C. It is understandable that, in a time of rapid inflation, the public interest may demand prompt settlement of a dispute between the Power Company and a customer that consumes over 21 per cent of the Company's entire electrical output for the State of Idaho. Under such conditions, the Power Company may no longer have the leisure to spend three years in negotiations (as occurred in the 1970 rate review with Bunker Hill) before reaching an exact determination of the income to be derived from the system's largest customer. In this case, however, no evidence was presented regarding the urgency of such a settlement, nor did the Commission make any specific finding that a following of the contract's provisions would have been adverse to the public interest. For this reason, too, we must set aside the order in this case.

Because we hold that the P.U.C. could not bypass the contract's provision for arbi-

tration, and could not override the rate structure established by the contract without an explicit finding that such provisions were contrary to the public interest, we find it unnecessary to reach the constitutional question raised by the wording of the Commission's Order in singling out Bunker Hill alone among industrial users for the progressive rate increase.

### III.

In its 1974 application before the P.U.C., the Power Company had been granted a 10 per cent general rate increase in order to generate the income necessary to insure an 8.40 per cent rate of return for its stockholders. The 1975 application by the Power Company was submitted because of an alleged $797,000 shortfall of revenues, resulting in an inability to meet the 8.40 per cent rate of return. The two Bunker Hill rate disputes which we have analyzed above play a central role since they account for more than 25 per cent of the revenue needed to eliminate this deficiency. Conversely, the Bunker Hill increases may not be necessary if the alleged deficiency cannot be demonstrated.

Bunker Hill's expert witness testified that the deficiency was due to the Power Company's method of allocating a disproportionate amount of its expenses to its Idaho customers. Two examples were given. First, it was shown that, after giving credit on sales for resale, the Power Company's total production and transmission costs for 1974 constituted 46.8 per cent of the Power Company's total electric revenues for that year. However, the allocation of these expenses for the State of Washington was 43.5%, whereas the allocation for the State of Idaho was 54.6%. If the system-wide average of 46.8% had been applied to each state equally, the net operating income for the 1974 Idaho operation would have been $1,171,468.00 greater—more than enough to wipe out the entire deficiency alleged in the 1975 application.

A second example concerned the Power Company's 9,575 miles of transmission and distribution electric lines. Expense costs on the entire system amounted to an average of $2,676.23 per mile in 1974. But the allocation for the 6,312 total miles of transmission and distribution lines in the State of Washington came to $2,391.32 per mile compared to a cost of $3,334.70 per mile on the 2,158 miles of line in Idaho. In short, Idaho customers paid $943.38 more per mile of line than was charged to Washington customers. Bunker Hill thus established a *prima facie* case of misallocation of expenses and revenues between the states of Washington and Idaho.

■ The allegations were never addressed at the hearing. The Power Company contented itself with stating its existing allocation formula which allocates cost to peak demand as well as to actual usage in each state on a three year weighted average. The P.U.C., in what it characterized as "lengthy and meticulous" findings, simply restated the Power Company's formula in two paragraphs of its Order. Its treatment of Bunker Hill's objections is as follows:

"Bunker Hill Company (Bunker) through its witness questioned the allocation procedures used between the states as set forth above. It contended that cost of production and transmission should be allocated on the basis of total revenues after deducting sales for resale from each state. This is one method that could be used. However, the Applicant's allocation formula for electric production and transmission plant and expenses has been accepted in the past by this Commission as a fair and reasonable method. We take cognizance of the Washington Commission's past acceptance of this formula. For one of the Commissions to change the formula without substantial evidence that supports the reasonableness of the change would seriously disrupt a reasonable and fair allocation of electric production and transmission plant and expenses between states."

In short, the Power Company's allocation formula must be accepted because it has always done business that way and because the state which is favored by the alleged

misallocation has not complained of such favorable treatment. This will not do.

As this Court stated recently in the case of *Boise Water Corporation v. Idaho Public Utilities Commission,* 97 Idaho 832, 555 P.2d 163 (1976):

> "It is . . . reversible error for the Commission not to make appropriate findings based on substantial evidence when such findings are material to the decision reached and when their absence precludes the reviewing court's ability to determine the reasonableness of the conclusions reached by the Commission." *Boise Water Corp. v. Idaho Pub. Util. Comm'n,* 97 Idaho at 844, 555 P.2d at 175.

*And see,* cases cited therein.

The burden we place upon the Commission is not a heavy one. It need not relitigate its past findings over and over again. Nor is it bound by the testimony of an intervenor's expert witness.

> "If it in its own expertise has the background from which to disagree with the conclusions of other experts, it may do so. However, if it chooses to do so, it must refer to matters in the record to substantiate its conclusion or place such matters in the record itself. See, *Application of Citizens Utility Co.,* 82 Idaho 208, 351 P.2d 487 (1960); *Davis,* supra, § 16.06 at 450–451. See also, *Washington Gas & Light Co. v. Pub. Util. Comm'n of D. C.,* 55 F.Supp. 627. That much at least is required in order to enable the reviewing court to determine that the Commission's decision is not capricious or arbitrary and thus not a denial of due process of law." *Boise Water Corp. v. Idaho Pub. Util. Comm'n,* 97 Idaho at 842, 555 P.2d at 173.

### IV.

In summary, we hold that the P.U.C. was within its rights in ruling that Bunker Hill must pay a 16.15 per cent increase as a result of the 1973 amendment to its contract with the Power Company. The issue was one of contract interpretation and each party had offered to prove before the P.U.C. that its version of the contract language was correct. The losing party may not object to an adverse ruling when, as here, there was ample evidence on the record to sustain such ruling.

The proposal to bring Bunker Hill up to the uniform level of Schedule 22 customers in four progressive increases, however, was a matter of contract abrogation, not contract interpretation. We hold that the P.U.C. cannot abrogate the terms of a contract in order to create uniform rates unless it first examines all relevant factors of service to comparable customers and expressly finds that a continuation of the rate specified in the contract would be adverse to the public interest. *No such finding was made in this case and thus the Commission's order cannot be affirmed.*

Finally, the Power Company's rate increases are necessary only if needed to make up for a revenue deficiency. Bunker Hill presented a *prima facie* case that the alleged deficiency was due to allocating expenses disproportionately to the Power Company's Idaho customers. The P.U.C. adduced no evidence whatsoever to justify its conclusion that the Power Company's formula for allocation was preferable to the one proposed by Bunker Hill. The absence of such findings precludes this Court's ability to determine the reasonableness of the conclusions reached by the Commission with regard to the 4 per cent general rate increase.

Since we cannot affirm the Commission's Order in its entirety, nor remand portions for further treatment below, we must set it aside in all respects. Idaho Constitution, art. V, § 9; I.C. § 61–629; *Intermountain Gas Co. v. Idaho Pub. Util. Comm'n,* 97 Idaho 113, 540 P.2d 775, at 791–792 (1975). It is SO ORDERED. Costs to appellant.

McFADDEN, C. J., DONALDSON and SHEPARD, JJ., and SCOGGIN, D. J. (ret.), concur.