627 P.2d 804

GRINDSTONE BUTTE MUTUAL CANAL COMPANY, Farm Development Corporation, West End Project, Basin Land Irrigation Company and Blaine Mecham, Appellants,

v.

IDAHO PUBLIC UTILITIES COMMISSION, Idaho Power Company, FMC Corporation, Monsanto Company, Idaho Irrigation Pumpers Association, Inc., J. R. Simplot Co., Idaho Citizens Coalition, Idaho Consumer Affairs, Inc., and City of Boise, Respondents.

In the Matter of the Application of IDAHO POWER COMPANY for Authority to Increase its Rates.

No. 12990.

Supreme Court of Idaho.

April 29, 1981.

William F. Ringert of Anderson, Kaufman, Anderson & Ringert, Boise, for appellants.

David Leroy, Atty. Gen., Michael S. Gilmore, Deputy Atty. Gen., Boise, for Idaho P. U. C.

Fred D. Decker, Twin Falls, for Idaho Power Co.

Roderick D. Gere of Idaho Legal Aid Services, Inc., Boise, for Idaho Citizen's Coalition.

DONALDSON, Justice.

Idaho Power Company filed an application with the Idaho Public Utilities Commission on February 28, 1977, requesting interim and permanent increases in rates and charges for electric service in the state

of Idaho. The Commission issued a Notice of Application and Hearing in this matter and subsequently, hearings were held before the entire Commission beginning in April of 1977.

The Commission issued Order No. 13158, dated May 16, 1977, granting Idaho Power interim rate relief in the form of a 7.09% uniform increase to all rates and charges. However, this interim order expressly provided that as for the pending permanent rate increase application, all issues remained at controversy, including rate design, and the grant of interim relief was without prejudice or predetermination to the remaining issues. On November 28, 1977, the IPUC issued Order No. 13568, again an interim order, which generally increased the uniform increase in billing to 10.3%. Jurisdiction was retained over the issue of rate structure with the proviso that new permanent tariffs would be established.

On February 6, 1978, the IPUC issued Order No. 13714, which is the subject of this appeal. That order authorized Idaho Power to file revised electric rate schedules consistent with the terms of the order. The present controversy concerns the Commission's determination of the structure for Schedule 24 under which the appellants, irrigation and soil drainage customers, received service. Schedule 24, as specifically set out in subsequent Order No. 13738, which augmented Order No. 13714, was restructured so as to result in rate increases of up to 19.6% for high volume-high load factor Schedule 24 customers.

Appellants filed with the Commission a petition for rehearing, proposing a uniform rate increase, and a supplemental petition for rehearing, setting forth additional grounds for consideration. Both petitions were denied. Appellants subsequently perfected this appeal seeking review of the Commission's decision regarding the rate design as it pertains to them as certain Schedule 24 customers.

Appellants initially argue that the Commission failed to give them adequate notice that the Commission intended to consider a revision in the rate structure which would impact in particular upon them as high demand-high load factor Schedule 24 customers. Appellants cite the case of *Grindstone Butte Mutual Canal Company v. Idaho Power Company*, 98 Idaho 860, 574 P.2d 902 (1978) [hereinafter *Grindstone I*], in support of their basic contention that parties must be given fair notice of exactly what the Commission proposes to do. *See Intermountain Gas Co. v. Idaho Public Utilities Commission*, 97 Idaho 113, 540 P.2d 775 (1975) (cited with approval in *Grindstone I*).

In *Grindstone I*, the record of that case reflects that there had been notice given that a general rate increase was under consideration and that there had been present on the record the data compilation upon which a rate increase would be based. Specifically, the Commission pointed to Exhibit 75, which showed a low rate of return for Schedule 24 users in comparison with other classes of users, and it argued that the appellants in that case should have discerned the significance of the exhibit. The significance of the exhibit, in combination with the general proposition that rate allocation is inherent in any rate increase, should have given adequate notice that Schedule 24 users would be subject to a rate increase and should be on guard to defend. This Court did not agree with the Commission's foregoing argument but found instead that it was not until the Commission's issuance of Order No. 11694, issued almost a year after the application for an increase in rates by Idaho Power, that the appellant users "had an inkling that rate structures applicable to their business were due for special attention." *Grindstone I* at 864, 574 P.2d at 906.

Turning to the record before us here, we find that a Notice of Application and Hearing was sent out to appellants approximately four days after the rate increase application was received by the Commission, which provided:

"YOU ARE FURTHER NOTIFIED that Applicant proposes to increase electric service rates for irrigation and soil

drainage pumping service, service to municipalities, the above designated Special Contracts, and all other customers, classes, and contracts, by approximately 22.8%.

. . . .

"YOU ARE FURTHER NOTIFIED that the Commission may determine that an increase in revenues should be an amount other than that proposed by Applicant, and that the spread or allocation of any rate increase granted should be other than that proposed by Applicant. The rates of all Idaho jurisdictional customers of Applicant are at issue and subject to change in this proceeding." (emphasis added).

■ We hold that appellant Schedule 24 users, upon receipt of this notice, were put upon adequate notice that rate structures applicable to their business were due for special attention and that they would be subject to a possible rate increase in the amount of approximately 22.8%, dependent upon the outcome of the proceedings before the Commission. The *Grindstone I* requirement of adequate notice has been met.

Appellants contend further that nowhere in the notice or proceedings were they notified that one specific segment of the Schedule 24 users would be singled out to bear the burden of a rate increase. We find this contention based upon segmented treatment to be without merit as regards the issue of adequate notice. Regardless of whether they be high demand-high load factor users or low demand-low load factor users, appellants, as members of the class of Schedule 24 customers, were adequately notified that they were being considered for a rate increase. The related issue of whether this segmented rate allocation is just and reasonable as regards appellants is discussed below.

As is well established, this Court is confined in its review of decisions by the Public Utilities Commission. The Idaho Constitution provides us with the jurisdiction to review but it also provides for legislative definition of the scope of review. Id. Const. Art. 5, § 9. Accordingly, I.C. § 61–629 provides in part:

"Matters reviewable on appeal—Judgment.—No new or additional evidence may be introduced in the Supreme Court, but the appeal shall be heard on the record of the commission as certified by it. The review on appeal shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order appealed from violates any right of the appellant under the Constitution of the United States or of the state of Idaho. Upon the hearing the Supreme Court shall enter judgment, either affirming or setting aside the order of the commission."

In light of this limited review, this Court has held:

"The Commission is a fact finding, quasi-legislative body authorized to investigate and determine issues presented by a utility's petition for increased rates. Where its findings are supported by competent and substantial evidence this Court is obliged to affirm its decision."

*Boise Water Corp. v. Idaho Public Utilities Commission,* 97 Idaho 832, 838, 555 P.2d 163, 169 (1976); *Application of Pacific Telephone & Telegraph Co.,* 71 Idaho 476, 480, 233 P.2d 1024, 1026 (1951).

Recently, this Court has reemphasized the limited review we may make. "In reviewing findings of fact we will sustain a Commission's determination unless it appears that the clear weight of the evidence is against its conclusion or that the evidence is strong and persuasive that the Commission abused its discretion." *Utah-Idaho Sugar v. Intermountain Gas Co.,* 100 Idaho 368, 376, 597 P.2d 1058, 1066 (1979).

■ Thus, our focus must be upon the evidence presented to the Commission. If the evidence is competent and substantial in support of the findings made and there has been no clear abuse of discretion, this Court is constrained to affirm those findings.

In the instant case, the Commission after an extended hearing made findings that previous rates were unjust and unreason-

able and that based upon the Commission's evaluation of the evidence, significant changes had to be made in rate structure and design. Accordingly, a revision of Schedule 24 resulted.

The new schedule eliminated the past declining block demand charges in favor of a single flat demand charge and reduced the energy blocks to two blocks during the summer season with a single flat energy charge in the off peak season. The Commission found the new schedule to substantially reduce the price benefits of volume consumption while continuing to give some benefit to high load factor customers with the result being a reduction in cost for the majority of pump irrigators, while large volume customers received increases up to 19.6%. The Commission further found this result to be just and reasonable under the circumstances.

■ This Court is of the opinion that the relevant findings as made by the Commission adequately apprise us in our limited reviewing capacity of the conclusions reached by the Commission. Our concern therefore, is whether the evidence supports these findings. Preceding review of the evidence, however, we note that our deter-

mination of whether the evidence is competent and substantial must be tempered by a consideration of whether the new rate structure is also just and reasonable. Rates determined by the Commission must be just and reasonable. I.C. §§ 61–301, 61–315 & 61–502.[1]

In the instant case, appellants contend that the Commission erred in the rate revision of Schedule 24 because it did so without evidence as to cost of service analysis. More specifically, appellants argue that there was inadequate quantitative evidence presented to provide a sufficient basis for rate differentiation within the schedule, that is, a 19.6% increase for high volume-high load factor pump irrigators at one end of the schedule and a 34.5% decrease for low volume-low load factor customers at the other end.

■ This Court has previously determined that cost of service is but one criterion among many for consideration in forming a basis for rate differentiation between classes of service and between classifications of customers within a certain schedule. In *Utah-Idaho Sugar v. Intermountain Gas Co., supra*, as between classes of service, i. e., one schedule as opposed to anoth-

1. I.C. § 61–301 provides:

"Charges just and reasonable.—All charges made, demanded or received by any public utility, or by any two (2) or more public utilities, for any product or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable. Every unjust or unreasonable charge made, demanded or received for such product or commodity or service is hereby prohibited and declared unlawful.'

I.C. § 61–315 provides:

"Discrimination and preference prohibited.— No public utility shall, as to rates, charges, service, facilities or in any other respect, make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, charges, service, facilities or in any other respect, either as between localities or as between classes of service. The commission shall have the power to determine any question of fact arising under this section."

I.C. § 61–502 provides:

"Determination of rates.—Whenever the commission, after a hearing had upon its own motion or upon complaint, shall find that the rates, fares, tolls, rentals, charges or classifications, or any of them, demanded, observed, charged or collected by any public utility for any service or product or commodity, or in connection therewith, including the rates or fares for excursions or commutation tickets, or that the rules, regulations, practices, or contracts or any of them, affecting such rates, fares, tolls, rentals, charges or classifications, or any of them, are unjust, unreasonable, discriminatory or preferential, or in any wise in violation of any provision of law, or that such rates, fares, tolls, rentals, charges or classifications are insufficient, the commission shall determine the just, reasonable or sufficient rates, fares, tolls, rentals, charges, classifications, rules, regulations, practices or contracts to be thereafter observed and in force and shall fix the same by order as hereinafter provided, and shall, under such rules and regulations as the commission may prescribe, fix the reasonable maximum rates to be charged for water by any public utility coming within the provisions of this act relating to the sale of water."

er, the relevant criteria included the quantity of the utility used, the nature of the use, the time of use, the pattern of use, the differences in the conditions of service, the costs of service, the reasonable efficiency and economy of operation and the actual differences in the situation of the consumers for the furnishing of the service. Specifically, as between classes of customers within a schedule, the criteria included contribution to peak load, costs of service on peak demand days, costs of storage and economic incentives. *Id.* at 377, 597 P.2d at 1067. *See Pennsylvania Public Utility Commission v. Metropolitan Edison Co.,* 86 P.U.R.3d 163, 195–96 (Pa.Pub.Util.Comm. 1970) and 64 Am.Jur.2d, Public Utilities § 117 (1972) (both cited in *Utah-Idaho Sugar v. Intermountain Gas Co., supra*). We find such criteria as being valid considerations for rate differentiation as between classes of service, whether those classes be as between schedules or as between customers within a schedule. We do not find one criterion to be necessarily more essential than another. Nor do we find the criteria as listed above as being exclusive. As this Court has stated in the past:

"Each case must depend very largely upon its own special facts and every element and every circumstance which increases or depreciates the value of the property, or of the service rendered, should be given due consideration, and allowed that weight to which it is entitled. It is, after all, very much a question of sound and well-instructed judgment." (citation omitted).

*Kiefer v. City of Idaho Falls,* 49 Idaho 458, 467, 289 P. 81, 84 (1930).

▪ Cost of service is not a *per se* essential element without which rate making is invalid. It is an important criterion and, in a given case, it may even be largely dispositive of the issue of basis for price differentiation as it was in *Grindstone I, supra.* Therein this Court held that the findings of the Commission were sufficient and sustained by substantial evidence which consisted primarily of a cost of service exhibit which showed that Schedule 24 users as a class produced a lower rate of return than

did other customers and were therefore properly subject to a higher percentage increase in rates. Even in *Grindstone I,* however, the Court considered applicable the following:

"The Commission had before it voluminous testimony concerning the economic conditions of the farming community, the future demands for power for pumping, and many other factors. Certainly we do not minimize the problems created by the 'economic squeeze' of increased costs with lowering prices, as testified to by members of appellant; but the record discloses these factors were fully considered by the Commission, and thus are not reviewable by this court, except to determine whether there was evidence to sustain the determination made [citation omitted]."

*Idaho Underground Water Users Association v. Idaho Power Co.,* 89 Idaho 147, 167–68, 404 P.2d 859, 871 (1965). Other factors besides cost of service were taken into consideration.

▪ Appellants cite the case of *Agricultural Products Corporation v. Utah Power & Light Company,* 98 Idaho 23, 557 P.2d 617 (1976), as basic authority for their contention that a rate decision made without considering cost of service is arbitrary. We find this case not so restrictive. *Agricultural Products* endorsed the following procedure employed by the New York Public Utilities Commission:

"Under the procedure we adopt here, a determination of undue discrimination or preference must first be made in a rate proceeding *wherein all pertinent factors are considered,* including, among others, the provisions of the special contract, the relationship between the contracting parties, the cost of service, the financial condition of the utility, and the effect of contract rates on other customers. In the rate proceeding, the commission will consider whether some preferential rate may be appropriate in light of the specific circumstances surrounding each special contract.... *Re Consolidated Edison Co.,* 4 P.U.R. 4th 199 (N.Y.Pub.Ser. Comm'n 1974)." (emphasis added).

*Id.* at 30–31, 557 P.2d at 624–25. Again cost of service is but one criterion to consider. The question then is not whether one particular type of evidence is present in support of the rate differentiation, but, rather, whether the evidence as a whole in light of the circumstances of the particular case supports the differentiation, substantially, competently and with a just and reasonable result.

■ Appellants contend that the Commission acted outside its constitutional and statutory limitations by giving consideration to the concepts of conservation, optimum use and resource allocation. We do not agree. While the Idaho Public Utilities Commission is a body with statutorily defined jurisdiction, it is also true that the Commission operates in the public interest to insure that every public utility operates as shall promote the safety, health, comfort of the public and as shall be in all respects adequate, efficient, just and reasonable. I.C. §§ 61–301 & 61–302.[2] The power to fix rates is for the public welfare. *Agricultural Products v. Utah Power & Light Co., supra.* The Commission has the authority to investigate and determine whether a rate is unjust, unreasonable, discriminatory or preferential, or in any wise in violation of any provision of law. I.C. §§ 61–502 & 61–503.[3] "Every power expressly granted, or fairly to be implied from the language used, where necessary to enable the Commission to exercise the powers expressly granted should be afforded." *Washington Water Power Co. v. Kootenai Environmental Alliance,* 99 Idaho 875, 879, 591 P.2d 122, 126 (1979). *Citing United States v. Utah Power & Light Co.,* 98 Idaho 665, 667, 570 P.2d 1353, 1355 (1977), *quoting* 64 Am.

Jur.2d, Public Utilities, § 232 (1972). Absent a legislative pronouncement to the contrary, we find it within the Commission's jurisdictional province to consider in its rate making capacity all relevant criteria including energy conservation and concomitant concepts of optimum use and resource allocation. In the proceedings below, we find no error in these considerations as made by the Commission in what it perceived as a need to develop new rate designs which would be responsive to current economic realities. It is in the public interest to make such considerations in decisions which impact upon the consumption of energy, especially in light of the advancing "political, economic and environmental costs imposed on society." *Bunker Hill Co. v. Washington Water Power Co.,* 98 Idaho 249, 253, 561 P.2d 391, 395 (1977).

■ Turning to the record before us, we find that the Commission identified three primary objectives of current utility rate design:

"They are (a) the revenue-requirement or financial-need objective, which takes the form of a fair-return standard with respect to private utility companies; (b) the fair-cost-apportionment objective, which invokes the principle that the burden of meeting total revenue requirements must be distributed fairly among the beneficiaries of the service; and (c) the optimum-use or consumer-rationing objective under which the rates are designed to discourage the wasteful use of public utility services while promoting all use that is economically justified in view of the relationships between costs incurred and benefits received. *J. Bonbright, Principles of*

2. For text of I.C. § 61–301, see footnote 1, *supra.* I.C. § 61–302 provides:

"Maintenance of adequate service.—Every public utility shall furnish, provide and maintain such service, instrumentalities, equipment and facilities as shall promote the safety, health, comfort and convenience of its patrons, employees and the public, and as shall be in all respects adequate, efficient, just and reasonable."

3. For text of I.C. § 61–502, see footnote 1, *supra.* I.C. § 61–503 provides:

"The commission shall have power, upon a hearing, had upon complaint, to investigate a single rate, fare, toll, rental, charge, classification, rule, regulation, contract or practice, or any number thereof, or the entire schedule or schedules of rates, fares, tolls, rentals, charges, classifications, rules, regulations, contracts or practices, or any thereof, of any public utility, and to establish new rates, fares, tolls, rentals, charges, classifications, rules, regulations, contracts or practices or schedule or schedules in lieu thereof."

*Utility Rates* at 292 (1961). *Application of Utah Power & Light Co.*, IPUC Order No. 13448 at 39 (Sept. 29, 1977)."

With these objectives thus established, the Commission considered the evidence presented. This included voluminous oral and written testimony. We note that much of this testimony is technical in nature and to a degree, this Court will temper its review with deference to the expertise of the Commission. *Cf. Utah-Idaho Sugar v. Intermountain Gas Co., supra* ("[T]he construction of technical terms and provisions in public utility schedules is an endeavor peculiarly within the realm of the Commission's expertise."); *Columbia Gas. Transmission Corp. v. Federal Power Commission,* 174 U.S.App.D.C. 204, 530 F.2d 1056 (1976) (the court will defer to some degree to agency views on the meaning of a contract where an understanding of documents involved is enhanced by the agency's technical knowledge of industry conditions and practices); *North Atlantic Westbound Freight Association v. Federal Maritime Commission,* 130 U.S.App.D.C. 122, 397 F.2d 683 (1968) (where underlying issues of fact and policy are involved, an agency's interpretation of an agreement is due judicial respect and deference). Deference to the expertise of the Commission extends to whether the Commission need be bound by expert testimony. *Bunker Hill Co. v. Washington Water Power Company, supra* (testimony need not be binding if contrary substantiated by record). *See generally Idaho Underground Water Users Association v. Idaho Power Co., supra* (certain technical considerations in ratemaking lie within the special competence of the agency).

The evidence before the Commission specifically included certain cost analysis information, notwithstanding appellants contention that there was no such evidence presented. We find that Exhibit 105 and Exhibit 104, both described as cost of service studies for 1975 and 1976 respectively, although never formally admitted as documentary evidence, were nonetheless marked and sponsored and formed the basis for much testimony, including the following given by an expert witness appearing at the instance of intervenor Idaho Irrigation Pumpers Association, Inc.:

"Q. Do you have those cost of service studies that were presented in this case? They are marked as Exhibits 104 and 105. 104 is for 1976 and 105 is for 1975.

A. The one for 1976 is—is it the one that is marked 105?

Q. 104.

A. 104. I have a copy here. I didn't have the marking number. Yes.

Q. Would you turn to page 1 of that exhibit.

A. Yes.

Q. And look at line 30, column 4, for irrigation—pardon me—column 3, which is irrigation.

A. You said page 1?

Q. Page 1, line 37. I'm sorry; line 37 and column 3.

A. Yes.

Q. And it shows a 5.068 per cent rate of return for irrigation service, does it not?

A. Yes.

Q. And column 1 on line 37 shows an overall rate or return of 7.327 per cent, does it not?

A. Yes.

Q. Do you have the other exhibit, 105, for 1975?

A. I think I have it. I'd have to do a little searching.

MR. DECKER: Mr. President, may I approach the witness?

COMMISSIONER LENAGHEN: Yes.

THE WITNESS: I have it, but I'd have to do a little searching to find it.

Q. BY MR. DECKER: Let me provide you with my copy and ask my question here, if you will. Does that look like the exhibit for 1975?

A. Yes.

Q. If you will look at the bottom, on line 30 and column 4, what rate of return is indicated there?

A. That is 3.36 per cent.

Q. And that is the indicated rate of return on rate base?

A. Yes.

Q. And what is the overall system figure shown in column 1?

A. That's 6.44 per cent. Now, we must note that this is for the year 1975 estimated, which is a couple years ago and doesn't reflect what rate changes have been made since that time. Record, vol. 8, p. 1200–02, (testimony by Mr. Moke)."

This testimony reflects that the two cost of service studies referred to indicated that irrigators provided a lower rate of return in comparison to the overall rate of return of the total system. To the extent this testimony properly appeared in the record or was judicially cognizable under I.C. § 67–5210, discussed *infra*, the Commission had it available for consideration. The possibility of there being testimony in the record upon which the Commission or a reviewing court could rely even though the exhibits which evoked the testimony were not admitted was brought to the attention of all parties in the hearings. Nonetheless, even though Exhibits 104 and 105 were not formally admitted into evidence, testimony concerning them was available for consideration.

There also appears in the record the testimony of numerous expert witnesses, militating both for and against rate restructuring, which related, among other things: (1) that Schedule 24 energy rates should be flattened because of the economics presented by Idaho Power's transition from a relatively low cost hydro generation system to a mixed system including relatively high cost thermal generation, but that because evidence was lacking as regards changes in rate of return as between classes of service, the increase should be distributed as an equal percentage increase (testimony by Dr. Willmorth); (2) that as a general proposition, irrigation pumpers pay a relatively lower price than other customers for electricity but that a change in the price scheme could lead to a destabilizing influence in the economy (testimony by Dr. Payne); (3) that all irrigators' cost per acre of power was yearly escalating (testimony by Mr. Gray); and (4) that in practice, the old Schedule 24 resulted in price disadvantages to the majority of irrigators (testimony by Mr. Bradley). This foregoing litany of testimony is by no means an exhaustive review of the many opinions expressed by the 25 witnesses who appeared before the Commission; it is but a brief sampling of the oral input that was available for consideration.

There are also the numerous exhibits admitted, including revenue studies, billing comparisons, farm income situation reports, various schedule proposals and research papers. While all of the evidence does not impact upon the issue at hand, we find that a substantial amount of its presents relevant criteria which was available for consideration by the Commission.

■ The Commission also took official notice of the historic development of electrical rate structuring, emphasizing the preferential treatment given high volume consumers through use of declining block rate form, a form which existed in Schedule 24 prior to the hearings. The Commission also noted the current economic realities which it found to require that the declining block design be eliminated in favor of one that would be more responsive to the related concepts of conservation, prudent use of electricity, fair cost apportionment and resource allocation while at the same time providing the statutorily mandated fair return to the utility company. Appellants contend that the Commission erred in contravention of I.C. §§ 67–5209 & 67–5210 as those sections refer to matters which may be officially noticed in a proceeding.[4] As

4. I.C. § 67–5209(g) provides that in such proceedings "[f]indings of fact shall be based exclusively on the evidence and on matters officially noticed. I.C. § 67–5210(4) provides:

"(4) notice may be taken of judicially cognizable facts. In addition, notice may be taken of generally recognized technical or scientific facts within the agency's specialized knowledge. Parties shall be notified either before or during the hearing, or by reference in preliminary reports or otherwise, of the material noticed, including any staff memoranda or data,

we have previously stated in this opinion, the Commission properly acted within its authority in making its considerations in light of current political, economic and environmental realities. We find that to the extent the Commission took official notice of these realities, its conduct did not rise above any impermissible level and it acted within the confines of the aforementioned statutes in utilizing its own "experience, technical competence, and specialized knowledge" in noticing and evaluating conditions as they presently exist.

■ In light of the foregoing evidence which was before the Commission, we find ample basis for its decision to restructure Schedule 24 as it did. It must be remembered that our review is statutorily confined and it is not our task to weigh this evidence. Rather, we are to determine whether there exists competent and substantial evidence, whether there has been an abuse of discretion and whether the end result is just and reasonable. Accordingly, we find the evidence presented to the Commission as being competent and substantial. We find no evidence presented of an abuse of discretion by the Commission. And we find the restructured Schedule 24 to be a just and reasonable response under the circumstances.

Thus, pursuant to I.C. § 61–629, we find that neither the foregoing issues we have specifically addressed nor any other as raised by appellants on this appeal present an incident of reversible error. We therefore affirm Commission Order No. 13714 as augmented by order No. 13738 as it pertains to the restructuring of Schedule 24.

BAKES, C.J., and McFADDEN and BISTLINE, JJ., concur.

SHEPARD, Justice, dissenting.

I have no quarrel with the majority's treatment of the notice aspect of this matter. I write to express my concern at the failure of the court to recognize new prob-

lems in public utility regulation. In my judgment, the complex new problems presented require more than the application of ancient shibboleths.

In years past this Court has reviewed orders of the Public Utilities Commission and, almost without exception, those matters have been involved with disputes between a utility and the Commission. Those cases almost inevitably involved requests for increase in utility rates based upon assertions that to do otherwise would deny the utility a fair rate of return. In those rare cases in which consumers were involved, the questions involved also related to the setting of rates allowing the utility a fair rate of return. The answers to those questions were, of course, founded on constitutional concepts concerning the deprivation of a utility's property right without due process and without just compensation much as in the manner of eminent domain. Although such cases involved highly complex and technical matters, such as plant valuation, itemization for above and below line rate base determination, ability to market securities and investor interest therein, and the like, the ultimate question remained the price a utility should be allowed to charge, at one end of the spectrum to be allowed only a fair return and at the other end of the spectrum to avoid an unconstitutional confiscation.

In those types of cases, this Court avoided many of the difficult questions presented through the device of presuming the expertise of the Commission resulting from long experience in the field. That reliance may have been misplaced, but in any event some expertise was evidently more desirable than the complete lack thereof on the part of this Court. At least the Commission had the benefit of staff to supply at least some modicum of expertise.

Seldom did this Court face the problem of consumers, the Commission and the public utility agreeing that increases in rates were necessary to assure a fair return to the

and they shall be afforded an opportunity to contest the material so noticed. The agency's experience, technical competence, and special-

ized knowledge may be utilized in the evaluation of the evidence."

utility. This Court now faces a new groundswell of cases which in essence do not pose the old problems and the old questions. Rather, while most or all of the involved parties agree that the utility deserves and requires additional finances, the question now becomes, as between the consumers of the utility, who will bear the burden of such increased costs and in what proportion. In my judgment, the answers to those questions become astronomical in importance and reach deeply into the economic, philosophic, political and sociological wellbeing and existence of this state and its future. This Court continues to make statements that the authority of the Public Utilities Commission extends to concepts of consumption, optimum use, resource allocation, considerations of advancing political, economic and environmental costs imposed on society, consumer rationing objectives, discouragement of the wasteful use of energy and relationships between costs incurred and benefits received. The Court then proceeds to indicate again, as is stated in the older class of cases, that the questions and answers are highly technical in nature and deference must be paid to the *expertise* of the Commission.

I doubt the continuing validity of the ascribing of such wisdom and omniscience to the members of the Idaho Public Utilities Commission. I doubt that our legislative branch of government so intended such power and authority when in 1913 it initially delegated certain portions of its legislative authority to the Public Utilities Commission. In stating the above, I in no way intend to impugn the intelligence, ability or dedication of the members of the Commission nor do I intend to suggest that the members of this Court are better able to or should attempt to resolve those problems.

It is simply a fact of life, however unpalatable, that today is not yesterday nor 1913 nor the good old days when energy sources were abundant and appeared inexhaustible and correlatively our people and their needs were relatively sparse. Today for a whole spectrum of reasons, valid or invalid, our supply of energy appears to be not only finite, but incapable of supplying all demands. Thus, the Commission has become involved and concerned with the methodology of production of energy and the impact thereof upon our political, sociological, economic and ecological environment. "Eco—system" has become one of our most fashionable buzz words.

While presently existing sources of energy appear to have reached optimum production capacity, demand continues to spiral upward. That rising demand results from many and complex factors, not the least is our population increase and the changing economic face of this state. From its early days this state has been agriculturally oriented and until recently it was gravity flow irrigation which made the arid desert lands of the great Snake River plain bloom and greenup with rich crops of many types. Today gravity is no bar to irrigation and the underground aquifer waters of the state are being tapped in ever increasing quantity. The process of lifting that water to the surface and distributing it by pressure has called for enormous new demands upon the supply of energy.

Our mining industry in the north has traditionally consumed large amounts of energy for the operation of its smelters. That demand is heightened by the development of the southeastern Idaho phosphates field with its additional high demand for sources of energy.

The above represent merely what are perhaps the more obvious new competing demands for energy in this state. Such competing demands bring in a myriad of new problems which require difficult decisions. What industry is to be favored or disfavored by the granting or denying of energy through methodologies such as peak load utilization in pricing, interruptible supply or perhaps a rate structure so high as to make uneconomic the continuation of an industry either in whole or in part?

Traditionally a consumer of energy has been charged a rate in some proportion, at least, to the costs of delivering energy to that consumer. Hence, a consumer who required a large amount of energy deliv-

ered at one spot particularly if utilized at non-peak times or on an uninterruptible basis might obtain what in common parlance might be said to be a "wholesale" rate. On the other hand, a householder who uses a relatively small amount of energy which can be distributed only over long and complicated lines and structures might suffer a much higher rate per kilowatt hour.

Although our statutes speak in great and high sounding words, I.C. § 61–301, "all charges * * * shall be just and reasonable," I suggest that the interpretation of such language lies mainly in the eye of the beholder. Our legislature has also in I.C. § 61–315 prohibited a public utility from granting any preference or advantage or subjecting any consumer to any prejudice or disadvantage. Rather clearly, in my mind at least, the only basis for charging one consumer more or less than another is if the costs to the utility of furnishing the service or energy is smaller or greater. Otherwise, I think it follows as logically as night follows day there is otherwise preference or discrimination. Here the majority tells us that cost of service "is but one criterion among many" but then only lapses into vague generalities to indicate the other criteria. Nevertheless, I deem it beyond question that certain classes of consumers are charged rates which exceed the cost of service to them. Correlatively, other classes of consumers are charged a rate which is less than their cost of service. Such procedure may only be "just" or "reasonable" if it is determined that in the residential class there is more "importance" to be attached to the numbers of persons served and the importance of residential lighting, heating and cooling, as contrasted with the production of crops or industrial products.

We have seen the mushrooming of a sociological phenomenon. The elderly, the poor and the otherwise disadvantaged are subsidized. Are we to see the same phenomenon in the field of public utility rate-making? While there have existed perhaps preferences and discrimination as between classes, is the Commission now to be authorized to authorize discrimination within a class on the basis that one household consumer is financially less able to pay than another? If such is not a function of the Commission, may another agency of government order the Commission to in turn order a utility to so differentiate in rates?

In conclusion, I reiterate that a new era has arrived or at least approaches. I find no legislative recognition of these new problems or any grant of authority to the Commission to adequately cope with and resolve those problems. See, however, Executive Order 76–4 of Governor Cecil D. Andrus dated July 30, 1976, creating an Office of Energy and establishing authority therein relating to energy demands, consumption, conservation, planning and coordination therefor with all other agencies. Further, I find no recognition by this Court of the existence of the new era and the problems its brings.