658 P.2d 936

**FMC CORPORATION, Appellant,**

v.

**IDAHO PUBLIC UTILITIES COMMISSION, Respondent,**

and

**Idaho Power Company, Co-Respondent.**

No. 13991.

Supreme Court of Idaho.

Feb. 2, 1983.

James N. Roethe, Pillsbury, Madison &
Sutro, San Francisco, Cal., and Michael R.

Southcombe, Clemons, Cosho & Humphrey, Boise, for appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., John J. McMahon and Samuel J. Petrillo, Deputy Attys. Gen., Boise, for respondent Idaho Public Utilities Com'n.

Paul L. Jauregui, Boise, and Larry D. Ripley, of Elam, Burke, Evans, Boyd & Koontz, Boise, for co-respondent Idaho Power Co.

N. Randy Smith, Boise, Louis F. Racine and Robert C. Huntley, Jr., Racine, Huntley, Olson, Nye & Cooper, Pocatello, William Ringert and Jeffrey Christenson, Anderson, Kaufman, Ringert & Clark, Boise, for intervenors.

McFADDEN, Justice Pro Tem.

This is an appeal by FMC Corporation from an order of the Idaho Public Utilities Commission establishing a new contract rate to be charged FMC for electric power delivered to FMC. We affirm the order of the Commission.

Idaho Power is a public utility providing electrical energy to consumers in Idaho, Nevada and Oregon. Idaho Power, since its inception, and until recently, was basically a hydroelectric utility. In recent years, in view of limitations on available hydro power, Idaho Power has had to utilize thermal generation facilities to supply the demands being placed on its system. FMC is a foreign corporation whose Idaho operations are located near Pocatello, Idaho. FMC is the largest single customer of Idaho Power, with annual purchases equal to approximately 17% of Idaho Power's total electric sales. FMC utilizes the bulk of the power sold to it in four electric furnaces at its phosphorous manufacturing plant. FMC's supply of electric service from Idaho Power is interruptible.

Idaho Power furnishes electrical service to FMC pursuant to a written agreement entered into between the parties on April 23, 1973. The agreement provides for delivery of electric service to FMC under four separate service schedules, each schedule staggered to expire at two year intervals, the first expiration being set for December 31, 1975. The agreement provides that FMC at its option could renew any expiring service schedule by giving one year's advance notice of its intent to renew. Not later than October 15 of the calendar year in which any service schedule was set to expire, the parties were to "agree upon rates and charges for the ensuing two year period to be included in each and every Service Schedule." In so acting, the parties were to give "consideration to the changes in all factors bearing upon the costs for the services supplied." The agreement further provides that a negotiated agreement would be submitted to the Commission for final approval.

FMC by letter dated December 8, 1978, gave notice to Idaho Power that it intended to renew the third service schedule, which was due to expire December 31, 1979. As mentioned above, in accordance with their agreement, FMC and Idaho Power were to reach a new agreement by October 15, 1979, which would cover the two year period beginning January 1, 1980. Despite good faith efforts, negotiations between the two parties proved unsuccessful and a deadlock ensued as to the rates to be charged FMC for electric service for the two year period beginning January 1, 1980.

On November 30, 1979, Idaho Power filed an application with the Commission requesting that a tariff schedule be substituted for the existing contract between Idaho Power and FMC. The matter was designated I.P.U.C. case no. U–1006–157 (hereinafter case no. 157). On the same day, FMC filed a petition requesting the Commission to resolve the existing contract impasse and establish a new contract rate for electrical service to FMC for the two year period beginning January 1, 1980. The matter was designated I.P.U.C. case no. U–1006–158 (hereinafter case no. 158).

A hearing was jointly held in cases nos. 157 and 158 on December 27, 1979, for the purpose of establishing a temporary rate for electrical service to FMC, effective January 1, 1980, and continuing thereafter un-

til a final resolution of the contract rate impasse could be arrived at by the Commission. During the course of that hearing a stipulation by all parties was presented to the Commission. The stipulation specified a temporary rate format under which FMC would continue to receive electrical service after January 1, 1980. The stipulation was accepted and approved by the Commission in order no. 15224, issued December 31, 1979. Additionally, pursuant to an agreement of all parties entered upon the record in that proceeding, the Commission determined that it would first proceed with the petition of FMC in case no. 158. The application of Idaho Power in case no. 157 would be held in abeyance until a decision was reached in case no. 158. Accordingly, the application of Idaho Power for approval of a tariff filing proposing a new rate schedule for FMC in case no. 157 was suspended pursuant to I.C. § 61–623 or until such time as the Commission entered an order with respect thereto.

On January 7, 1980, the Idaho Irrigation Pumpers Association, Inc. (hereinafter Irrigators), together with several other parties, was granted leave to intervene in cases nos. 157 and 158.

On February 28, 1980, FMC filed with the Commission a proposal for a new contract rate. Testimony and exhibits in support of the FMC proposal were submitted on March 10, 1980. On March 31, 1980, FMC filed a motion to consolidate cases nos. 157 and 158 as well as Idaho Power's pending application for general rate relief from all of its

customers except FMC (I.P.U.C. case no. U–1006–159, hereinafter case no. 159). The Commission approved the motion of FMC to consolidate the records in cases nos. 157 and 158, but nonetheless determined that it would consider the petition of FMC in case no. 158 prior to addressing the application of Idaho Power in case no. 157. A decision to consolidate case no. 159 with cases nos. 158 or 157 was deferred.

On April 18, 1980, a motion was filed by Idaho Power requesting a prehearing conference and bifurcation of the hearings in case no. 158. FMC filed a response in opposition to the motion. The Commission denied the motion and scheduled a hearing to commence on June 30, 1980 for the purpose of considering the petition submitted by FMC in case no. 158.

During the course of the hearing, only FMC and intervenor Irrigators presented contract rate proposals for consideration. The FMC contract rate proposal recommended that the preexisting rate for electrical service be increased by approximately 29% or $3,956,300 in calendar year 1980, and provided for an additional increase of 8.29% or $1,458,000 over the proposed 1980 rate in calendar year 1981. The Irrigators' contract rate proposal recommended that the preexisting rate for electrical service be increased by approximately 96% or $13,240,-800.

In support of their respective contract rate proposals, both parties submitted cost of service studies.[1] The cost of service

---

1. As their name implies, cost-of-service studies attempt to apportion to each customer class the various costs incurred by a utility in providing utility service to that class. There are basically four steps involved in any cost-of-service study, and in this regard, the following testimony of witness Yankel on behalf of the Irrigators, is to be noted:

"Q What are the major steps that make up a fully distributed cost-of-service analysis? A In general, there are four steps involved in determining which customer groups are responsible for various costs incurred by a utility. The first step is to delineate the investment in the facilities that provide service during a given test year. The costs of opera-

tion, maintenance, and depreciation must also be developed for this same time period.

The next step in a cost-of-service analysis is to take the rate base investment and annual costs and place them into functional categories. The major functions generally used for purposes of cost allocation are production, transmission, distribution and customer.

The third step in the process of developing a fully distributed cost analysis is the classification of costs. Essentially, the classification step involves the arrangement of costs and investments in a manner that reflects the service characteristics for which such costs are incurred. The characteristics that are usually employed when classifying costs include demand usage, energy consumption, and the number of customers.

study offered by FMC was prepared by Mr. James Lim, while the cost of service study submitted by the Irrigators was developed by Mr. Anthony Yankel. Both were embedded cost analyses. A major difference between the two studies concerned the method in which Idaho Power's thermal plant investment was to be classified. Mr. Lim recommended that Idaho Power's thermal plant investment be classified totally as a demand related cost and all variable costs of operating the thermal plant as energy related. In contrast, the cost of service study developed by Mr. Yankel and submitted by the Irrigator's recommended that approximately 70% of Idaho Power's fixed investment in its thermal plant be classified as an energy related cost and only 30% of those costs be treated as demand related. The other primary difference between the cost of service studies presented was the chosen method to allocate demand related costs. The cost of service study submitted by FMC incorporated the average and excess demand (AED) method of allocating demand costs whereas the cost of service study presented by the Irrigators opted in favor of the average of the twelve coincident peak (12 CP) approach.

The testimony at the hearing tended to focus upon these differences in the two cost of service studies as well as the credit to be assigned FMC for receiving electrical service from Idaho Power on an interruptible basis.

Faced with only these two studies, the Commission concluded in order no. 15866, case no. 158, that the cost classification and allocation approaches endorsed by the Irrigators were better suited to the Idaho Pow-

er system than those advanced by FMC. Nonetheless, the Commission observed that under the Irrigator's contract proposal, FMC would have been required to pay approximately 17 mills/kwh for electric energy or about 95% more than its previously approved contract rate of 8.7 mills per kwh. In this regard the Commission found that the rate proposed by the Irrigators should be offset by a credit of 2.5 mills/kwh so as to adequately reflect the interruptible benefits afforded Idaho Power by the existing contractual arrangement with FMC. Thus, the Commission established a final contract rate requiring FMC to pay roughly 14.5 mills/kwh. FMC subsequently filed a petition for rehearing and upon the Commission's denial of that petition, timely perfected the instant appeal.

Although numerous sub-issues are presented on appeal, the arguments of the parties tend to focus on the following questions of law: (1) did FMC receive adequate notice of the nature and scope of the proceedings below; (2) is there substantial evidence in the record to support the findings of the Commission; (3) is the contract rate, as established, nondiscriminatory; and (4) is the Commission without authority to base a new contract rate on evidence submitted by a third party intervenor without first finding that the rate proposed by the parties (here FMC) was not in the public interest?

I *Adequacy of Notice.*

Appellant argues that the Commission in its "Notice of Hearing" dated May 8, 1980, failed to provide it with adequate notice that the Commission would consider application of new classification and cost allocation methods in this case.[2] Citation is made

---

The fourth step in this process, and the one that has received the most attention in the past, is to take the functionalized and classified rate base investment and annual costs of the utility and then allocate these costs among classes of service. In most cases, this is done with the application of allocation factors that reflect the relative pressure exerted by various customer classes on various services that the utility provides."

**2.** The "Notice of Hearing" provided in relevant part:

"YOU ARE HEREBY NOTIFIED that the Commission has determined that a hearing shall be held in the above entitled matter on MONDAY, JUNE 30, 1980, COMMENCING AT 9:30 A.M. IN THE COMMISSION HEARING ROOM, 472 WEST WASHINGTON STREET, BOISE, IDAHO AND CONTINUING THEREAFTER AS NECESSARY.

YOU ARE FURTHER NOTIFIED that FMC Corporation has filed testimony and exhibits comprising its direct case with the Commission Secretary. Copies of said testimony and exhibits are on file with the Commission Sec-

to the case of *Grindstone Butte Mutual Canal Company v. Idaho Power Co.,* 98 Idaho 860, 865, 574 P.2d 902, 907 (1978) (*Grindstone I*), for the proposition that the Commission, acting in its rate making capacity, may set new rates for utility service only after the customers affected have received fair notice of exactly what the Commission proposes to do. *See Intermountain Gas Co. v. Idaho Public Utilities Comm'n,* 97 Idaho 113, 540 P.2d 775 (1975) (cited with approval in *Grindstone I*). It is also noted by appellant that appurtenant to the right to notice is the right to be fairly notified as to the specific significant issues to be considered by the Commission. *Grindstone Butte Mut. Canal v. Idaho Power Co., supra.*

Neither respondent Commission nor respondent Idaho Power quarrel with these propositions, but rather, draw attention to the case of *Grindstone Butte Mut. Canal Company v. Idaho Public Utilities Comm'n,* 102 Idaho 175, 627 P.2d 804 (1981) (*Grindstone II*). There appellant argued that a notice of hearing was deficient because it failed to notify appellant that the Commission intended to consider a revision in its rate structure for irrigation and soil drainage customers of the utility. Specifically, in *Grindstone Butte II* the notice provided:

"YOU ARE FURTHER NOTIFIED that Applicant proposes to increase electric service rates for irrigation and soil drainage pumping service, service to municipalities, the above designated Special Contracts, and all other customers, classes, and imately 22.8%.

. . . .

YOU ARE FURTHER NOTIFIED that the Commission may determine that an increase in revenues should be an amount other than that proposed by Applicant, and that the spread or allocation of any rate increase granted should be other than that proposed by Applicant. The rates of all Idaho jurisdictional customers of Applicant are at issue and subject to change in this proceeding." 102 Idaho at 177–78, 627 P.2d at 806–807.

The court held that the foregoing notice satisfied the requirements of *Grindstone I,* observing that appellants "upon receipt of this notice, were put upon adequate notice that rate structures applicable to their business were due for special attention and that they would be subject to a possible rate increase . . . ." 102 Idaho at 178, 627 P.2d at 807.

■ The court is in agreement with respondents that a similar holding is warranted in this case. At the time the notice of hearing was issued, neither Idaho Power nor any of the intervenors had as yet prefiled their testimony in the case. The Commission, therefore, was unaware of the ex-

retary and are available for public inspection at the Commission offices during regular business hours.

YOU ARE FURTHER NOTIFIED that Idaho Power Company shall prefile its direct case in this matter on Friday, June 6, 1980. Other parties of record intending to present testimony and exhibits in this matter shall prefile such testimony and exhibits with the Commission Secretary no later than Monday, June 16, 1980.

YOU ARE FURTHER NOTIFIED that the purpose of the proceedings scheduled herein is to attempt to set a contract rate for FMC and Idaho Power Company as requested in the petition submitted by FMC on November 30, 1979. As a result of the hearings in this matter, the Commission may determine that the contract rate to be applicable to FMC should be more than or less than the temporary rate now being paid for electrical service by FMC pursuant to the stipulation entered into by FMC and IPC on December 27, 1979.

To the extent that a contract rate established for the parties is other than the temporary rate now in effect, the rates paid by other classes of customers served by Idaho Power may vary (See Commission Order Nos. 15420 and 15440).

YOU ARE FURTHER NOTIFIED that, as a result of hearings in this matter, the Commission may determine that it cannot set a contract rate for FMC and Idaho Power Company in accordance with the contract entered into by those parties on April 23, 1973. In the event that this Commission cannot set a contract rate, subsequent hearings will be necessary to determine the appropriate pricing format under which FMC can continue to receive electrical service from the Idaho Power Company.

YOU ARE FURTHER NOTIFIED that the hearings to be conducted in this matter shall be held pursuant to the Rules of Practice and Procedure adopted by the Idaho Public Utilities Commission on September 24, 1979."

tent to which these parties would participate in the contract rate proceedings. Nevertheless, the Commission anticipated that "various proposals" would be submitted, and so stated in its notice. The Commission also informed appellant that the final contract rate might be "more or less than the temporary rate" then being paid by appellant, which rate was predicated upon the classification and allocation methods recommended by appellant. Finally, it is a fact of life in proceedings before regulatory agencies that rate setting for individual customers or for customer classes invites all interested parties to submit cost of service studies and requires the agency to consider them. In this regard the court has previously stated that "when [a utility] filed a proposed tariff for a rate increase, it was necessarily put upon notice that the Commission would consider the questions traditionally raised in ratemaking ...." *Intermountain Gas Co. v. Idaho Public Utilities Comm'n, supra,* 97 Idaho at 129, 540 P.2d at 791. In sum, it is the court's conclusion that appellant was given adequate notice that new classification and allocation methods would be considered by the Commission and possibly adopted by the Commission.

## II  *Sufficiency of the Evidence*

In the instant case the Commission, in establishing a final contract rate between appellant and Idaho Power of 14.5 mills per kwh of electrical service provided appellant, made several relevant findings with respect to the cost of service studies underlying appellant's and respondent Irrigators' respective contract rate proposals. Specifically, the Commission made the following findings.

"The cost of service study offered by FMC in this case was prepared by Mr. James Lim, while that submitted by the Irrigation Pumpers Association was developed by Mr. Anthony Yankel. Both are embedded cost analyses. As mentioned above, a major difference between the two studies concerns the measure in which thermal plant investment has been classified. Mr. Lim proposes to treat all

of IPC's thermal facilities as demand-related costs. Mr. Yankel, on the other hand, recommends that approximately 70 percent of the fixed investment in thermal plant be assigned to energy and only 30 percent of those costs to demand.

We are persuaded that the classification approach taken by Mr. Yankel more accurately portrays the functional character of fixed plant costs. We do not accept the position advanced by FMC that cost incurrence for thermal plant is determined primarily by demand requirements. Thermal facilities are designed to supply both capacity and energy requirements of a utility. It is essential that the classification step properly recognize the purpose for which utility investment is designed as well as the operational characteristics of those facilities. The FMC study does not, in our opinion, observe this two-dimensional nature of system planning and operation. We find this shortcoming particularly critical with an energy-constrained utility system such as Idaho Power Company.

The primary difference between the cost of service studies presented in this case stems from the methods chosen to allocate demand-related costs. Mr. Lim recommends that the Average and Excess Demand (AED) methodology be utilized while Mr. Yankel has opted in favor of the twelve coincidental peak (12 CP) approach. The allocation method chosen should reflect as closely as possible the unique characteristics of the utility system in question. This presents something of a problem in this case since we are not entirely satisfied with either of the demand cost allocation methods offered. Based on the record, however, we find that the 12 CP approach better approximates the present load characteristics of the Idaho Power Company than does the AED method proposed by FMC. Data submitted during the hearing indicates that IPC is rapidly becoming a dual peaking system. Also apparent is the fact that off peak months are generally growing at a faster rate than are the summer

peak months. Under these circumstances we agree that the 12 CP method is more acceptable than the AED methodology. In addition we are persuaded that the 12CP approach (1) reflects overall system load patterns, (2) recognizes the importance of scheduled maintenance and exchange agreements during off peak periods and, (3) recognizes the growth in peak load during 'off peak' periods. Finally, we observe that the 12 CP method is consistent with the interstate allocation methodology chosen in IPC's pending general rate case [case no. 159]."

Appellant contends that the Commission erred in so finding.

In *Grindstone II, supra,* this court had occasion to reaffirm the standard of appellate review applicable in our review of decisions by the Commission. In particular, we observed:

"As is well established, this Court is confined in its review of decisions by the Public Utilities Commission. The Idaho Constitution provides us with the jurisdiction to review but it also provides for legislative definition of the scope of review. Id. Const. Art. 5, § 9. Accordingly, I.C. § 61–629 provides in part:

'Matters reviewable on appeal—Judgment.—No new or additional evidence may be introduced in the Supreme Court, but the appeal shall be heard on the record of the commission as certified by it. The review on appeal shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order appealed from violates any right of the appellant under the Constitution of the United States or of the state of Idaho. Upon the hearing the Supreme Court shall enter judgment, either affirming or setting aside the order of the commission.'

In light of this limited review, this Court has held:

'The Commission is a fact finding, quasi-legislative body authorized to investigate and determine issues presented by a utility's petition for increased rates. Where its findings are supported by competent and substantial evidence this Court is obliged to affirm its decision.'

*Boise Water Corp. v. Idaho Public Utilities Commission,* 97 Idaho 832, 838, 555 P.2d 163, 169 (1976); *Application of Pacific Telephone & Telegraph Co.,* 71 Idaho 476, 480, 233 P.2d 1024, 1026 (1951).

Recently, this Court has reemphasized the limited review we may make. 'In reviewing findings of fact we will sustain a Commission's determination unless it appears that the clear weight of the evidence is against its conclusion or that the evidence is strong and persuasive that the Commission abused its discretion.' *Utah-Idaho Sugar v. Intermountain Gas Co.,* 100 Idaho 368, 376, 597 P.2d 1058, 1066 (1979).

*Thus, our focus must be upon the evidence presented to the Commission. If the evidence is competent and substantial in support of the findings made and there has been no clear abuse of discretion, this Court is constrained to affirm those findings."* 102 Idaho at 178, 627 P.2d at 807. (Emphasis added.)

Additionally, in *Boise Water Corporation v. Idaho Public Utilities Commission,* 97 Idaho 832, 840, 555 P.2d 163, 171 (1976), we held that: "[T]he Commission must present in its order the basic (not merely 'ultimate') facts necessary to support reasonably its conclusion regarding facts in issue … what is essential are sufficient findings to permit the reviewing court to determine that the Commission has acted nonarbitrarily."

■ While the challenged findings might have been more explicit and detailed, the Commission nonetheless recited sufficient facts to apprise us in our limited reviewing capacity the basis for its determination. A review of the record discloses voluminous oral and written testimony, as well as numerous exhibits, impacting upon the challenged findings of the Commission. It would unduly lengthen this opinion and serve no salutory purpose to enter into a discussion of the evidence supporting the challenged findings of the Commission.

Suffice it to say that a careful and thorough examination of the record discloses that the evidence is both substantial and competent in support of those findings.

The next issue presented on appeal is whether the Commission erred in its "determin[ation] that the increase resulting from the [Irrigators'] study should be offset by a credit of 2.5 mills (or $4,049,800) to fully recognize the interruptible benefits afforded Idaho Power by the existing contractual arrangement with FMC." This determination was prefaced with the following comments:

"In our minds, a fair credit for interruptible service can only be ascertained by carefully weighing each of the interruptible features of the contract in conjunction with their usefulness to the utility system. In the final analysis, the credit allowed must be largely a matter of informed judgment. It is intellectually dishonest to suggest otherwise."

Appellant disagrees and asserts that there is substantial quantitative evidence in the record to warrant an appropriate interruptible credit at a minimum level of $5,064,192. Specifically, attention is drawn to the following testimony of Mr. Lim:

"Q Have you attempted to quantify the amount of fixed charges for installed reserve that Idaho Power is able to avoid by having FMC as an interruptible customer?

A Yes, I have. If all of FMC's 240 mw of demand were taken on a firm basis, Idaho Power would require 268.8 mw of additional capacity (assuming Idaho Power could serve FMC on a firm basis with a reserve of only 12 percent, an assumption I make with some reservation). An inexpensive way that Idaho Power could obtain that additional capacity would be through a purchase of capacity from BPA under BPA's F–7 rate schedule ($18.84 per kw year). For the entire 268.8 mw, the cost to Idaho Power for the required capacity would be: 268,800 kw x $18.84/kw year = $5,064,192 per year. This figure is conservative as I am quite certain that the low cost BPA firm peak-

ing capacity would not be suitable to serve as capacity and reserve for a high load factor firm load such as FMC's. If a new thermal plant were built to supply the additional required capacity, the cost would be much higher. Units currently under construction are estimated to cost from $768 per kw to $1130 per kw to construct ($205 to $300 million for a 426,-800 kw plant). Using the lower figure, which corresponds with the estimated cost of the Valmy Unit No. 1, the carrying charges on such a plant would range from approximately $30 to $41 Million annually.

Thus, Idaho Power avoids at least $5,064,192 per year for installed reserve capacity because FMC's load is interruptible. I would recommend that this consideration be weighed heavily when determining the rate FMC will pay for the service it receives, as it substantially reduces the cost imposed upon the system for having FMC as a customer."

Appellant concludes that the Commission erred in not considering this evidence and instead basing its findings upon "no objective evidence of value at all."

Appellant's argument misstates the record. The Commission did consider the testimony of Mr. Lim, but rejected it in important particulars. As noted in order no. 15866, the interruptibility credit incorporated in Mr. Lim's testimony was calculated by assuming that since service provided to FMC is interruptible, no firm capacity or installed reserve is required to serve it. The Commission determined that the record did not substantiate this proposition. In particular, Mr. Lim's assumption was rebutted on the record by Mr. Donald Barclay, Vice President, Planning and Resources, Idaho Power:

"Q The FMC Corporation contract is divided into two parts: primary energy and secondary energy. For purposes of resource planning, do you treat the two types of energy as being the same?

A No. One-half of the energy FMC Corporation contracts for, the contracted amount being up to 250 megawatts, is

classified as primary power. Idaho Power Company is obligated to provide this amount of power except for 300 kilowatt hours per kilowatt per year. For all practical purposes, I am required to consider for purposes of resource planning that the primary power is firm power.

Q Doesn't Idaho Power Company have the ability to interrupt this power?

A Yes, but the Company finds itself in the position of only being able to use the primary power interruption, for periods of very short duration. Once the 300 hours of interruptibility has been used Idaho Power Company would have the firm obligation of being required to make available to FMC Corporation the full amount of the primary power for the balance of that year. The primary interruptibility of FMC Corporation power is really only available for short periods of time when an emergency exists on the Idaho Power Company system. The primary interruptibility is considered to be of a load shedding nature."

The Commission therefore rejected Mr. Lim's $5,064,192 interruptibility credit (approximately 3.1 mills/kwh) and substituted, instead, a credit of some $4,049,800 (2.5 mills/kwh).

In arriving at a 2.5 mill/kwh interruptibility credit, the Commission took account of numerous other considerations presented in the hearing:

"While the interruptible provisions of the contract are perhaps less valuable than in the past, the contract still affords significant benefits to the Idaho Power system. As an interruptible customer, FMC acts as a substitute for costly installed reserve capacity that would otherwise be required for IPC under applicable intercompany pool agreements. FMC also provides an important load management tool for Idaho Power Company. The secondary portion of the contract amount (120 MW) may be interrupted up to 50 percent in a given year, with the entire contract amount (240 MW) subject to a 23.7 percent interruption over a ten year time span. In addition, Idaho Power may also use FMC for load-shedding purposes, thereby enabling the power company to automatically terminate service to FMC whenever a system emergency occurs.

The benefits provided by the FMC service agreement are not without limitation however. Under the contract, IPC may only interrupt the FMC primary service 300 hours in a given year. For resource planning purposes, IPC has stated that primary power must be considered as firm power. IPC also maintains that the continuing shift to a hydro-thermal system and its change in planning criteria from critical to median water have substantially reduced the value of the interruptible provisions in the present contract."

■ We agree with the Commission that these considerations do not permit precise quantification. There is a tension between interruptibility as a contractual right and interruptions as actually exercised, between the value of interruptibility to Idaho Power and its cost to FMC. To suggest that the 2.5 mill/kwh interruptibility credit is "arbitrary" because it is the product of the Commission's informed judgment in light of these considerations rather than the output of Mr. Lim's quantitative analysis would be to strike at the very heart of the ratemaking authority of the Commission. It is the court's conclusion that the Commission did not err in this regard.

III  *Unlawful Discrimination and the Final Contract Rate*

Appellant next argues on appeal that the end result of the Commission's order in this case is a rate structure that is discriminatory as to it under the strictures of the applicable statutes and case law of this state. In connection with this argument, appellant also contends that the Commission's order "imposes a 'substantial disproportionate' increase for FMC over other customers despite the fact that 'there was absolutely no evidence introduced by anyone even addressing itself to changes in economic factors' since the last Idaho Power rate case."

Pursuant to I.C. § 61–502, the Commission is charged with the duty of determining just and reasonable rates or classifications.

"61–502. Determination of rates.— Whenever the commission, after a hearing had upon its own motion or upon complaint, shall find that the rates, fares, tolls, rentals, charges or classifications, or any of them, demanded, observed, charged or collected by any public utility for any service or product or commodity, or in connection therewith, including the rates or fares for excursions or commutation tickets, or that the rules, regulations, practices, or contracts or any of them, affecting such rates, fares, tolls, rentals, charges or classifications, or any of them, are unjust, unreasonable, discriminatory or preferential, or in any wise in violation of any provision of law, or that such rates, fares, tolls, rentals, charges or classifications are insufficient, the commission shall determine the just, reasonable or sufficient rates, fares, tolls, rentals, charges, classifications, rules, regulations, practices or contracts to be thereafter observed and in force and shall fix the same by order as hereinafter provided, and shall, under such rules and regulations as the commission may prescribe, fix the reasonable maximum rates to be charged for water by any public utility coming within the provisions of this act relating to the sale of water."

And I.C. § 61–503 further provides:

"61–503. Power to investigate and fix rates and regulations.—The commission shall have power, upon a hearing, had upon its own motion or upon complaint, to investigate a single rate, fare, toll, rental, charge, classification, rule, regulation, contract or practice, or any number thereof, or the entire schedule or schedules of rates, fares, tolls, rentals, charges, classifications, rules, regulations, contracts or practices, or any thereof, of any public utility, and to establish new rates, fares, tolls, rentals, charges, classifica-

tions, rules, regulations, contracts or practices or schedule or schedules in lieu thereof."

In connection with these statutory duties and authority, it is to be noted that I.C. § 61–315 bars any public utility from maintaining "unreasonable differences" among various classes of customers.

"61–315. Discrimination and preference prohibited.—No public utility shall, as to rates, charges, service, facilities or in any other respect, make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, charges, service, facilities or in any other respect, either as between localities or as between classes of service. The commission shall have the power to determine any question of fact arising under this section."

In this regard the Commission is not under a duty to set rates for different classes of customers which are either equal or uniform provided the rates set are just and reasonable. *Grindstone Butte Mut. Canal Co. v. Idaho Power Co.,* 98 Idaho 860, 866, 574 P.2d 902, 908 (1978). As was recently observed by the court in *Utah-Idaho Sugar Co. v. Intermountain Gas Co.,* 100 Idaho 368, 377, 597 P.2d 1058, 1067 (1979):

" 'There is no requirement that rates for different classes of service must be either uniform or equal or that they must be equally profitable. Differences in rates between classes of customers based on such criteria as the quantity of electricity used, nature of the use, the time of the use, the pattern of the use, or based on differences of conditions of service, or cost of service are not only permissible but often are desirable and even necessary to achieve reasonable efficiency and economy of operation.' *Pennsylvania Public Utility Comm'n v. Metropolitan Edison Co.,* 86 P.U.R.3d 163, 195–96 (Pa. Pub.Util.Comm.1970).

'A discrimination as to rates is not unlawful where based upon a reasonable classification corresponding to actual differences in the situation of the consumers for the furnishing of the service; and a public utility or a municipal corporation operating a public-service plant may make reasonable classification as to rates for public service.' 64 Am.Jur.2d Public Utilities § 117 (1972)."

With the foregoing in mind, appellant directs the court's attention to the fact that although the quality of appellant's service from Idaho Power is inferior to that of every other class of service, the contract rate established for appellant (14.5 mills/kwh) by the Commission's order was higher than the rates which were in effect at that time for two other special contract customers—J.R. Simplot Company (13.4 mills/kwh) and Monsanto (11.1 mills/kwh). Upon initial review these differences in rates appear to be patently discriminatory and unlawful.

As noted earlier, service to appellant is interruptible. Service to J.R. Simplot is firm. Thus there are occasions when due to power shortages or equipment breakdowns, service to appellant is interrupted almost completely, while all firm customers (including J.R. Simplot) continued to be served. In spite of this, Simplot's service more closely resembles the service to appellant than any other customer in Idaho Power's service area: both are large industrial users; both take service at exactly the same point of interconnection and at the same voltage level; and both maintain an average load factor in the 75% to 85% range. Nonetheless, there are two major differences between the service to appellant and that to Simplot, both reflecting a lower cost to serve appellant per kw or kwh of power delivered: (1) appellant's service is interruptible while Simplot's is firm; and (2) appellant receives much more power at its single point of interconnection than does Simplot (240 MW v. 25 MW). Appellant also asserts:

"Similarly ... Monsanto, another elemental phosphorous producer outside Idaho Power's service area but receiving 70 MW of interruptible power from Idaho Power, would receive its interruptible service for 11.1 mills/kwh as compared with FMC's rate of 14.5 mills. This is in spite of the fact that Idaho Power is obligated to serve Monsanto only during heavy load hours, i.e., those hours when the demand on its system is the highest, rendering service more costly ..., while FMC takes service 24 hours a day. In all other respects, the interruptibility provisions of FMC and Monsanto service afford Idaho Power approximately the same per cent of interruptibility of its total obligation to serve those customers."

The foregoing comparisons, though persuasive at first glance, are inapposite to the question of unlawful discrimination. The essence of the instant case was the resolution of a deadlock in negotiations between appellant and Idaho Power, i.e., should appellant's contract with Idaho Power (or at least the term providing for a two year rate) be abrogated. Appellant contended that a two year rate, as prescribed in the contract, was necessary so that it might plan its operations with a fair degree of reliability. Idaho Power requested that a tariff rate for service to appellant should be established in lieu of a contract rate, subject to periodic adjustment in all general rate cases. The Commission staff also recommended that the two year rate provided for in the contract between appellant and Idaho Power be abrogated.

However, on this most fundamental issue of the case, the Commission ruled in favor of appellant: as requested by appellant, the Commission established a contract rate for electric service to appellant for a two year period beginning January 1, 1980. Virtually all of appellant's allegations of unlawful rate discrimination are without substance when this most critical element of the case is considered. In each prior contract adjustment dating back to 1976, appellant submitted itself along with all other customers to general rate case proceedings before the Commission and its contract rate was adjusted in connection with the general

rate case proceedings. As a result, appellant's contract rate was always set in tandem with the rates for other customers and comparisons in the different rate structures could be made with some validity. In November 1979 appellant initiated this proceeding to set a contract rate for a two year period effective January 1, 1980; subsequently, it argued successfully that its contract rate proceeding should not be consolidated with the pending general rate proceeding for all other customers. Thus, the contract rate set for appellant no longer would be in synchronization with the rates for other tariff and special contract customers, with the end result being that at the beginning of this two year contract period appellant would experience a rate increase that would be temporarily disproportionate to those other customers. Conversely, toward the end of the two year contract period, appellant's rate would slip below those of other customers.

Within this framework, it is evident that the comparisons advanced by appellant are flawed in that the interim rates of Simplot and FMC were frozen until the final order in the general rate proceedings was issued, precisely because appellant prevailed in its argument that the contract rate should be set first in a proceeding separate and apart from the general rate case. Thus the proper rate structures to be used in comparing appellant's rates with those of other special contract customers is the one established in the Commission's final order in the general rate case proceeding, which is before this court by way of augmentation. Under that order, the following rates for Idaho Power's major industrial customers are set: FMC, 14.55 mills/kwh; Monsanto, 14.95 mills/kwh; and Simplot, 15.48 mills/kwh. At the bottom line, these rates preserve roughly the same historic rate differentials that have existed for some years between these customers.

■ Beyond these considerations, and most importantly, appellant's arguments of discrimination are premised upon the singular fact of a mere difference in the rates charged the various customers. As stated earlier, such is insufficient to establish unjustifiable discrimination; rather, "each case must depend very largely upon its own special facts, and every element and every circumstance which increases or depreciates the value of the property, or of the service rendered, should be given due consideration, and allowed that weight to which it is entitled." *Application of Boise Water Corp.,* 82 Idaho 81, 87, 349 P.2d 711 (1960). The record in the instant case provides no basis for making such an analysis as to whether or not there exists unlawful discrimination between the final contract rate set for appellant in this case and the final rates set for Idaho Power's other customers in the general rate case proceeding. That is, although the Commission's order in the general rate case is before this court, the evidentiary record underlying it is not.

Appellant's other claim of discrimination is that as a result of the Commission's order in this case it has received a "substantial disproportionate [percentage] increase," almost three times more than that it imposed upon the other customer classes in the general rate proceeding.

In the instant case, the disparity in rates between appellant and other customer classes grew up gradually. As noted by appellant in its opening brief, there have been "three general rate cases going back to 1975 where relatively uniform [percentage] rate increases had been spread over all customer classes. The only significant exception was a somewhat disproportionate increase to FMC" in the 1976 rate case. As is mathematically obvious, the result of five years of uniform percentage increases is that the gap will progressively widen between customers whose rates were initially low and those whose rates were high. For example, in 1973, when appellant signed its present contract, it was receiving power at 4.73 mills/kwh. The residential rate averaged 17.1 mills/kwh in that year. At the time appellant's rate was set at 14.5 mills/kwh in this case, the residential rate

had ballooned to an average of 29.5 mills/kwh. Using appellant's method of comparing only *percentage* rate increases, it is true that appellant's rates have more than tripled since 1973, whereas residential rates have increased "only" 73%. In absolute numbers, however, appellant's rates have increased only 9.8 mills/kwh whereas the residential rate has increased 12.4 mills/kwh—or 26% more than appellant's increases in absolute numbers. We find no error by the Commission in this regard.

## IV  Applicability of Adversity Standard

In *Agricultural Products Company v. Utah Power & Light Co.,* 98 Idaho 23, 28–29, 557 P.2d 617, 622–623 (1978), this court made the following pertinent statements concerning the Commission's power to affect a private utility contract:

"Contracts of any sort are protected by the Idaho Constitution, which provides in Article I, § 16 that no 'law impairing the obligation of contracts shall ever be passed.' Any contract is thus assured some measure of protection from governmental interference.

. . . .

[T]he power to alter a rate contract is not unlimited. The United States Supreme Court noted in *Arkansas Natural Gas Co. v. Arkansas R.R. Comm'n,* 261 U.S. 379, 43 S.Ct. 387, 67 L.Ed. 705 (1923), that: 'The power to fix rates, when exerted, is for the public welfare, to which private contracts must yield; but it is not an independent legislative function to vary or set aside such contracts, however unwise and unprofitable they may be. Indeed the exertion of legislative power solely to that end is precluded by the contract impairment clause of the Constitution. The power does not exist per se. *It is the intervention of the public interest which justifies and, at the same time conditions its exercise.* 261 U.S. 379, 43 S.Ct. at 388 . . . .'

To justify state interference with the utility contract, there must be a finding that the rate 'is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory. *Federal Power Comm'n v. Sierra Pac. Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956)' "

In appellant's petition for rehearing of the order in this proceeding it raised for the first time the contention that the instant proceeding to set a new contract rate should be bound by the foregoing standards established in *Agricultural Products.* In response, the Commission ruled that "the evidentiary standard applicable to contract modification" did not apply to this case. In the alternative, the Commission found that both the end of year 1979 rate and the temporary rate paid voluntarily by appellant after February 28, 1980, were so low as to adversely affect the public interest.

Appellant takes exception· on appeal to both findings and argues: (1) that since the parties agree that "the contract was never abrogated," it follows that "the old or existing contract remained in effect" until such time as the Commission "found it necessary to modify that rate" as being so low as to adversely affect the public interest; and (2) that "the Commission's belated finding of adversity to the public interest was supported by no substantial evidence of record."

Appellant's argument mischaracterizes the sequence of events during this proceeding. It is undisputed that FMC's service schedule was due to expire on December 31, 1979. The stipulation signed by all parties of record on December 27, 1979 therefore set two "temporary rates pending the Commission's setting a new rate." The first temporary rate was to run from January 1, 1980 until February 28, 1980 (or until appellant filed its direct case, if sooner). During this time appellant was to continue receiving power under the end of year 1979 rates. The second "temporary" rate was to take effect on February 28, 1980 (or when appellant filed its direct case if sooner) and

would be "that rate which it [FMC] proposes to the Commission as the new contract rate." That rate would continue to be paid "until a new rate is placed into effect by the Commission." The temporary rates voluntarily paid by appellant pursuant to the stipulation were placed into effect only as a means by which FMC could continue to receive electrical service until such time as the Commission could establish "new rates." All parties fully understood this. Evidence of this understanding is seen in those provisions of the stipulation whereby appellant agreed that the new contract rate eventually set by the Commission would be paid retroactively to January 1, 1980. The entire structure of the stipulation thus mirrors the petition of appellant and the express understanding of all parties, namely, that the old rates expired on December 31, 1979 because of lack of "agreement by the parties on the rates and charges." Thereafter, the task of the Commission was to set a new rate, not to modify an existing rate.

In the final analysis, appellant's argument on the adversity standard amounts to little more than a play on words. Appellant argues that the Commission must have been "modifying" an existing rate since both appellant and Idaho Power agree that the contract was not "abrogated when the parties failed to reach an agreement on the appropriate new rate." In so arguing, appellant fails to distinguish between the contract and the 1980–81 contract rate. Idaho Power did propose abrogating the contract rate provision entirely and substituting a tariff therefor. The Commission staff did propose abrogating that part of the contract rate provision that required setting a two year rate. The Commission rejected both proposals. At no point did the Commission "modify," "abrogate," "interfere with," "vary," "set aside" or "override" any provision of the contract between Idaho Power and appellant.

 We therefore hold that the Commission did not modify an existing contract or a contract rate at all. Therefore, it was not incumbent upon the Commission before setting a new contract rate here to first find that the existing contract rate was adverse to the public interest.

The order of the Commission is affirmed.[3] Costs to respondents.

DONALDSON, C.J., and BAKES and BISTLINE, JJ., concur.

SHEPARD, J., dissents without opinion.

---

**3.** During the pendency of the instant appeal, appellant made application to stay indefinitely the rate increase allowed by the Commission in order no. 15866. The application was accompanied by a stipulation that if the order were ultimately affirmed, appellant would pay Idaho Power the amount which they would have paid under the order, *i.e.*, $5.4 million per year in an interest bearing account under supervision of the court. Commission order no. 15866 having been affirmed by way of today's opinion, appellant is directed to make payment of the deposited funds to Idaho Power.